*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 28**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

CHRISTINA L. GARDNER,
*Appellant,*

*v.*

NELSON D. GARDNER,
*Appellee.*

No. 20170598
Filed June 27, 2019

On Direct Appeal

Third District, Salt Lake
The Honorable Matthew Bates
No. 164902102

Attorneys:

Robert W. Hughes, Julie J. Nelson, Erin B. Hull,
Salt Lake City, for appellant

Jill L. Coil, Luke A. Shaw, Kyle O. Maynard, Sandy,
David W. Read, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1    After a twenty-two year marriage, Nelson Gardner and
Christina Gardner divorced. Before the divorce trial, they settled
issues related to child custody and the distribution of their marital
property. But they could not agree on the proper terms of
Mr. Gardner's alimony obligation to Ms. Gardner. After a three-day
bench trial, the district court determined that Ms. Gardner was
entitled to alimony, but, because of her extramarital sexual affairs,
the court reduced her alimony award in amount and duration.

¶ 2    Specifically, the court calculated the amount of the alimony award based on Ms. Gardner's expected reasonable monthly expenses, rather than on the monthly expenses she had incurred while married to Mr. Gardner. The court also set the alimony award for a period of ten years rather than the maximum statutory length of twenty-two years. The court stated that it was making these reductions because it did not believe it would be fair, where Ms. Gardner's conduct had substantially contributed to the demise of the marital relationship, to obligate Mr. Gardner to maintain Ms. Gardner at the standard of living she enjoyed during the marriage.

¶ 3    Ms. Gardner now appeals the terms of the alimony award, arguing the court erred in the following respects: (1) in determining that her infidelities substantially contributed to the end of the marriage; (2) in setting the specific terms of the alimony award; (3) in imputing income to her at an "arbitrary amount"; (4) in failing to consider the tax burden of the alimony award; and (5) in denying her request for attorney fees. Because none of the alleged errors constituted an abuse of the district court's discretion or were plainly incorrect, we affirm the district court's alimony determination on all counts.

### Background

¶ 4    Nelson Gardner and Christina Gardner were married for twenty-two years before divorcing in 2017. During the course of the marriage, Mr. Gardner worked full-time, and Ms. Gardner stayed home with their five children.[1] Although the couple had agreed to this arrangement, after their youngest child turned five, Mr. Gardner frequently encouraged Ms. Gardner to work outside the home or to obtain additional education.

¶ 5    At the time of the divorce, Mr. Gardner worked as a "global director of business development," making roughly $200,000 per year. Ms. Gardner, on the other hand, did not have consistent employment but "occasionally worked part-time, earning $11 or $12 per hour." Ms. Gardner does not have a college degree or any professional license, but she has earned money teaching swimming,

---

[1] Although Mr. Gardner had only four children with Ms. Gardner, Mr. Gardner helped raise Ms. Gardner's son from a previous marriage and treated him "as his own." At the time the divorce decree was entered, the couple had two minor children: M.G.G., age 17 and S.L.G., age 15.

piano, sewing, and art classes. Also, she has earned sizeable commissions for her artwork, although not on a consistent basis.

¶ 6    The couple's relationship had a lot of "ups and downs" throughout the marriage. Mr. Gardner testified that the key factor in the couple's marital discord was Ms. Gardner's "multiple episodes of infidelity." In 2007 and 2009, Ms. Gardner had extramarital sexual affairs. Although the parties appeared to have "reconciled and moved on" following these affairs, the court found that Mr. Gardner had suspected Ms. Gardner of having another affair in 2013. And, according to Mr. Gardner, the "final nail" was in 2016 when he discovered that Ms. Gardner had developed an "inappropriate relationship" with another man. He made this discovery after Ms. Gardner was injured in an accident while allegedly spending time with that man.[2] Mr. Gardner filed for divorce shortly thereafter.

¶ 7    Although both parties also testified to the existence of other marital problems, including "mutual verbal abuse" and one act of physical abuse by Ms. Gardner, as well as to arguments over finances and marital responsibilities, the district court found that it was Ms. Gardner's "sexual relationships with persons other than [Mr. Gardner that] substantially caused the breakup of the marriage relationship." The district court determined that this constituted "fault" under Utah Code section 30-3-5, and so could be considered as part of the court's alimony determination.

¶ 8    The court factored fault into its alimony determination in two ways. First, it held that, due to Ms. Gardner's fault, it need not pursue the typical goal of equalizing the standards of living between the parties.[3] Second, it determined that Ms. Gardner was not entitled to alimony "for the maximum allowed duration." It reasoned that these reductions were warranted because it would be "unfair for one of the parties to cause the breakup of the marriage relationship but to continue to enjoy the temporal and material benefits of having the (ex-)spouse support an affluent life-style enjoyed by both during the marriage."

---

[2] Although this final affair had not yet progressed to a sexual relationship, Mr. Gardner believed that it soon would.

[3] *See Gardner v. Gardner*, 748 P.2d 1076, 1081 (Utah 1988) (explaining that a general goal in an alimony determination is to "equalize the parties' respective standards of living" to the extent possible).

¶ 9   The court departed from the goal of equalization by calculating Ms. Gardner's alimony award based on "reasonable monthly expenses" rather than on the expected monthly expenses she incurred while living at the lifestyle she enjoyed before the divorce. This resulted in a $1,513 reduction in Ms. Gardner's estimated "need"—from $6,950 to $5,437 per month.

¶ 10 The court arrived at this reduced number, in part, by reducing her expected housing expenses "from $2,455 [per] month to $1,600 [per] month." It concluded that although $1,600 per month might not be enough to buy a home in her former neighborhood, it should be enough to rent "a three bedroom apartment . . . in that area" or to purchase "a modest home, probably on the west side of the freeway." The court also reduced other anticipated living expenses, such as Ms. Gardner's anticipated car payment and gas and utility expenses, to reflect more "reasonable" monthly expenses.

¶ 11 With Ms. Gardner's adjusted monthly expenses in mind, the court set out to calculate an alimony payment amount that would meet her needs. As the first step in this calculation, the court imputed an income of $1,300 per month to Ms. Gardner.[4] Next, the court factored in the $2,137 per month in child support payments that Ms. Gardner would be receiving from Mr. Gardner until the two minor children turned eighteen or graduated from high school, whichever occurred later. Finally, the court awarded Ms. Gardner $2,000 per month in alimony payments. Adding the imputed income, child support, and alimony together, the court calculated that Ms. Gardner would have an income of $5,437 ($4,137 of which would come from Mr. Gardner) per month to match her expected reasonable needs of $5,437.

---

[4] The court arrived at its imputed income amount by "imput[ing] income to [Ms. Gardner] at a minimum wage level as if it [were] full-time." Although the court found that Ms. Gardner's "physical impairments from the accident diminished her ability to work full-time," it did not believe there was "enough evidence . . . to find she is incapable of working." Despite determining that she was incapable of working full-time, the court calculated her imputed income on a full-time basis because it concluded that due to "her position in life and the fact that she does have some skills as far as she has worked before," she probably could find a job earning more than minimum wage. We note that Ms. Gardner's trial counsel conceded that "imputing minimum wage [would be difficult], but . . . appropriate under the law and under the statute."

¶ 12 The court also determined that the alimony payment amount would increase to $2,368 per month once their second youngest son turned eighteen or graduated from high school. And it would increase again to $3,128 per month once their youngest son turned eighteen or graduated from high school. Thereafter, the alimony amount would decrease by $200 per year until the term for alimony expired or terminated for another reason. The court explained that this "step-down" arrangement was designed "to encourage [Ms. Gardner] to start working, get[] some education, or, if she is indeed disabled,[5] to seek income from a government or charitable disability program."

¶ 13 Although the court acknowledged that under the adjusted monthly totals, Ms. Gardner would not be able to enjoy "the same affluent life-style that she had during the course of the marriage," it explained that such a result was fair in light of its fault determination because to do otherwise would have the effect of "penaliz[ing] Mr. Gardner for something that really did not appear . . . was his fault."

¶ 14 The court also factored fault into its alimony calculation by deciding that Ms. Gardner was "not entitled to receive alimony for the maximum allowed duration under the statute, which is the length of the marriage." So the court ordered Mr. Gardner to pay alimony for a ten-year period, rather than the maximum allowed period of twenty-two years.[6]

¶ 15 Ms. Gardner now appeals the terms and the length of the alimony award. The appeal was initially filed in the court of appeals, but that court certified it to us. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(b).

**Standard of Review**

¶ 16 Ms. Gardner raises a number of issues on appeal. First, she challenges the district court's fault determination, as well as the terms of her alimony award. We review a district court's alimony

---

[5] The court had previously ruled that Ms. Gardner had failed to produce evidence that her health problems left her "incapable of working."

[6] The divorce decree states that "[a]limony should automatically terminate in the event [Ms. Gardner] remarries, cohabitates, either party dies, or the term of the alimony expires on August 1, 2026; whichever occurs first."

determination "for an abuse of discretion and 'will not disturb [its] ruling on alimony as long as the court exercises its discretion within the bounds and under the standards we have set and has supported its decision with adequate findings and conclusions.'"[7] Second, she argues that the district court plainly erred when it failed to account for the tax burden imposed by the imputed income and by Ms. Gardner's alimony award. This issue was not preserved, so we address it under the plain error doctrine.[8] Finally, Ms. Gardner argues that the court abused its discretion when it failed to award her attorney fees under Utah Code section 30-3-3(1). We review a district court's decision to award attorney fees pursuant to this statute for an abuse of discretion.[9]

**Analysis**

¶ 17 Ms. Gardner challenges several aspects of the district court's alimony determination. First, she argues the court abused its discretion when it determined that "statutorily-defined fault substantially contributed to the breakup of the marriage." Second, she argues the court misapplied the law in determining the terms of the alimony award without achieving "the first two 'primary aims of alimony.'" Third, she argues the court abused its discretion in imputing income to her. Fourth, she argues the court plainly erred by failing to consider her tax burden when determining the alimony amount. And finally, she argues the court abused its discretion when it declined to award her attorney fees under the divorce statute.

¶ 18 In divorce actions, a district court "is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity."[10] Accordingly, we will reverse only if (1) "there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error";[11] (2) the factual findings upon

---

[7] *Dahl v. Dahl*, 2015 UT 79, ¶ 84, ---P.3d--- (alteration in original) (quoting *Connell v. Connell*, 2010 UT App 139, ¶ 5, 233 P.3d 836).

[8] *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443.

[9] *Dahl*, 2015 UT 79, ¶ 168.

[10] *Goggin v. Goggin*, 2013 UT 16, ¶ 44, 299 P.3d 1079 (citation omitted) (internal quotation marks omitted). For this reason, "we will not disturb a court's distribution of marital property 'unless it is clearly unjust or a clear abuse of discretion.'" *Id.* (citation omitted).

[11] *Id.* (citation omitted) (internal quotation marks omitted).

which the award was based are "clearly erroneous";[12] or (3) the party challenging the award shows that "such a serious inequity has resulted as to manifest a clear abuse of discretion."[13] Because "we can properly find abuse only if no reasonable person would take the view adopted by the trial court," appellants have a "heavy burden" to show that an alleged error falls into any of these three categories.[14] After reviewing the district court's alimony determination under this standard, we conclude that none of the errors Ms. Gardner alleges constitute reversible error. Accordingly, we affirm.

I. We Affirm the District Court's Determination That
Ms. Gardner's Affairs Substantially Contributed to the Divorce

¶ 19  First, we consider whether the district court abused its discretion by determining, under Utah Code section 30-3-5(8)(c), that Ms. Gardner was at fault in causing the divorce. We hold that it did not.

¶ 20  The court found that Ms. Gardner had engaged in wrongful conduct during the marriage that substantially contributed to the breakup of the marriage relationship. But in doing so, the court did not explain how it defined the term "substantially contributed"—a term that is not defined in statute or our caselaw. So, as part of our determination, we must clarify what constitutes conduct that "substantially contributes" to a divorce. Under this clarified standard, we conclude that the district court did not err in making its fault determination.

---

[12] *Dahl v. Dahl*, 2015 UT 79, ¶ 121, ---P.3d---; *see also id.* ("[W]e give due regard to the district court's superior position from which to judge the credibility of witnesses.").

[13] *Goggin*, 2013 UT 16, ¶ 44 (citation omitted) (internal quotation marks omitted).

[14] *Id.* (citation omitted) (internal quotation marks omitted); *see also Dahl*, 2015 UT 79, ¶ 119 ("Thus, we will uphold the decision of the district court on appeal 'unless a clear and prejudicial abuse of discretion is demonstrated.'" (citation omitted)); *Davis v. Davis*, 2003 UT App 282, ¶ 7, 76 P.3d 716 (quoting *Breinholt v. Breinholt*, 905 P.2d 877, 879 (Utah Ct. App. 1995)) (explaining that when reviewing the trial court's findings of fact, "we will reverse only if the findings are clearly erroneous").

*A. Under Utah Code section 30-3-5(8)(c), "substantially contributed"*
*means conduct that was a significant cause of the divorce*

¶ 21   Utah Code section 30-3-5(8)(b) authorizes courts to consider "the fault of the parties in determining whether to award alimony and the terms of the alimony." And Section 30-3-5(8)(c) states that a spouse's participation in an extramarital affair constitutes fault if it "substantially contributed" to the breakup of the marriage. No Utah appellate court has defined what constitutes conduct that "substantially contributed" to a divorce. Accordingly, we consider the meaning of the term as a matter of first impression.

¶ 22 Under the plain meaning of the term "substantially contributed," the conduct at issue must be an important or significant factor in the divorce, but it does not have to be the first cause, or the only cause.[15] Merriam-Webster's Collegiate Dictionary defines "substantial" variously as "not imaginary or illusory," "considerable in quantity," and "being largely but not wholly that which is specified."[16] Although none of these definitions are a perfect fit with the use of "substantial" in section 30-3-5(8), each definition suggests that "substantial" means a considerable or important part of something, but not necessarily the entire part. Under these definitions, a substantial cause is one that is sufficient to lead to the breakup of the marriage, but is not necessarily the only identifiable cause. This is the same way in which "substantial" is used in other areas of law.

¶ 23   For example, in Utah we employ a "substantial factor" test when determining causation in negligence actions.[17] Black's Law Dictionary defines the "substantial-cause test" as the "principle that causation exists when the defendant's conduct is an important or significant contributor to the plaintiff's injuries."[18] So according to Black's Law Dictionary, a substantial cause can be defined as an "important or significant contributor" to a particular harm.

---

[15] *Cf. McCorvey v. Utah State Dep't of Transp.*, 868 P.2d 41, 45 (Utah 1993) ("[T]here can be more than one proximate cause or, more specifically, substantial causative factor, of an injury.").

[16] *Substantial*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998).

[17] *See, e.g., Devine v. Cook*, 279 P.2d 1073, 1080 (Utah 1955) (applying the substantial factor test in a negligence case).

[18] *Substantial-cause test*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶ 24 And the Restatement (Second) of Torts defines "substantial" similarly:

> The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as *a cause*, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense," yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.[19]

¶ 25 So, like the Black's Law Dictionary definition, the Restatement describes a substantial cause as a cause that a reasonable person would consider an important or significant factor in the bringing about of a specific event. This definition applies equally well in the divorce context.

¶ 26 As with harm in a negligence case, a "great number of events" may have contributed to a divorce. In fact, we have previously recognized "that it is seldom, perhaps never, that there is any wholly guilty or wholly innocent party to a divorce action."[20] So in almost all divorce cases, it could be argued that each spouse contributed in some way to the breakup of the marriage.[21] But some

---

[19] RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965) (emphasis added).

[20] *Wilson v. Wilson*, 296 P.2d 977, 979 (Utah 1956).

[21] This is especially true when the alleged "fault" is infidelity. Infidelity and marital discord often walk hand in hand. As we have previously noted, "when people are well adjusted and happy in marriage, one of them does not just ou[t] of a clear blue sky fall in love with someone else." *Id.* at 979. So when a district court is presented with evidence of infidelity and asked to determine fault, it will almost always be presented with a chicken-and-egg type dilemma: did marital discord lead to infidelity or did infidelity lead to marital discord? But section 30-3-5(8) does not require district courts to resolve that dilemma before considering fault in an alimony determination. Instead, it requires only that the court determine whether the infidelity "significantly contributed" to the breakup of the marriage.

causes are clearly more substantial, or significant, than others. So even though it may be impossible to state with certainty a sole, or even the first, cause leading to the breakup of the marriage, it will certainly be possible in many cases for a court to determine the significant or important causes of the divorce.

¶ 27 Accordingly, we conclude that "substantially contributed" to the breakup of the marriage is conduct that was a significant or an important cause of the divorce. Under this definition, conduct need not be the sole, or even the most important, cause for it to substantially contribute to a divorce. So when an important or significant cause falls into a category of conduct specifically identified in section 30-3-5(8), courts are authorized to consider it in an alimony determination, even if the at-fault party can point to other potential causes of the divorce.

*B. The district court did not abuse its discretion in determining that Ms. Gardner's extramarital affairs substantially contributed to the divorce*

¶ 28 In this case, the district court held that Ms. Gardner's "infidelity substantially contributed to the breakup of the marriage relationship." As Ms. Gardner herself acknowledges in her brief, fault in this case could be established only if the court found that Ms. Gardner (1) "engag[ed] in sexual relations with a person other than the party's spouse" and by so doing she (2) "substantially contributed to the breakup of the marriage."[22] Ms. Gardner claims that "no conduct meets both [of these] elements." But the district court found otherwise. Because the court did not misapply the law, and its findings are not clearly erroneous, it did not abuse its discretion in concluding that Ms. Gardner's conduct substantially contributed to the breakup of the marriage.

¶ 29 In the divorce decree, the district court found that Ms. Gardner "had affairs involving sexual relations with persons other than her spouse in 2007 and 2009." The court also found that Mr. Gardner "suspected another affair in 2013 and [Ms. Gardner] admitted to an inappropriate relationship in 2016 at the time of the filing of petition for divorce[,] [which] had not yet become physical." Finally, the court found that Mr. Gardner "filed for divorce because [Ms. Gardner] had previously been unfaithful and had commenced another inappropriate relationship that [Mr. Gardner] believed would become a sexual relationship." Based on these factual

---

[22] UTAH CODE § 30-3-5(8)(c).

findings, the court determined that "Ms. Gardner's sexual relationships with persons other than [Mr. Gardner] substantially caused the breakup of the marriage relationship." The court did not misapply the law in making this determination.

¶ 30 Ms. Gardner argues the court erred by characterizing her relationship with another man in 2016 as a sexual relationship. But she does not point to any place where the district court suggested that the 2016 relationship constituted a sexual relationship. Rather, the court determined that Ms. Gardner had engaged in extramarital affairs in 2007 and 2009, and then found that "Ms. Gardner's sexual relationships with persons other than [Mr. Gardner] caused the breakup of the marriage relationship." Accordingly, Ms. Gardner fails to show that the court misapplied the law by incorrectly characterizing a non-physical relationship as a sexual relationship.

¶ 31 Ms. Gardner also fails to show that the court's fault finding was clearly erroneous. Importantly, she does not deny that she engaged in extramarital affairs in 2007 and 2009, so the first element of fault is met. Instead, she argues that the district court clearly erred when it found those affairs to have substantially caused the breakup of the marriage. We disagree.

¶ 32 In reviewing a district court's factual findings, we must keep in mind that the district court "has a comparative advantage in its firsthand access to factual evidence, and because there is no particular benefit in establishing settled appellate precedent on issues of fact, there is a potential downside and no significant upside to a fresh reexamination of the facts on appeal."[23] So, under our clearly erroneous standard, we will disturb a court's factual findings only where the court's conclusions do not logically follow from, or are not supported by, the evidence.[24]

¶ 33 Ms. Gardner argues the court clearly erred for two reasons. First, she asserts the court clearly erred in concluding that other causes "did not substantially contribute to the breakup of the marriage relationship," because "'irreconcilable differences' provided not only '[an]other reasonable explanation,' but the most 'reasonable explanation' for the divorce." Second, she asserts the court clearly erred because the extramarital affairs played a "relatively minor role in the divorce." But neither argument convinces us that the court's findings were clearly erroneous.

---

[23] *Myers v. Myers*, 2011 UT 65, ¶ 32, 266 P.3d 806.

[24] *Gardner v. Gardner*, 748 P.2d 1076, 1078 (Utah 1988).

¶ 34 As evidence of irreconcilable differences, Ms. Gardner points to "multiple disputes unrelated to the infidelity," including disputes over their level of religious involvement, their division of labor in the home, and finances, as well as to episodes of mutual verbal abuse, and one episode in which she hit Mr. Gardner. But, as we have already discussed, conduct need not be the first, or only, cause of the breakup of the marriage for it to substantially contribute to the divorce. Instead, it need only be an important or significant cause. So the evidence of other sources of contention does not foreclose the possibility that Ms. Gardner's multiple episodes of infidelity substantially contributed to the divorce. And when the other evidence presented at trial is considered, we conclude that the district court's fault determination is not clearly erroneous.

¶ 35 In fact, the record evidence suggests that Ms. Gardner's extramarital affairs were a significant, if not the primary, impetus for the demise of the marriage. At trial, Mr. Gardner was asked what fueled the breakup of the parties' marriage, and he replied as follows:

> It goes back a long ways. There's been lots of ups and downs in the marriage, lots of ups and downs. There's been infidelity that took place back in 2005, '6, '7, I don't know the actual time periods. I know that it was real to me in 2007. There was additional infidelity that took place in February of 2009 and on and on. The date of her accident, I believe she was with someone who was probably an inappropriate friend as well.

¶ 36 Mr. Gardner was then asked to confirm whether "these infidelities . . . led to the demise of the marriage," to which he replied that it "was clearly a very big impetus for where [they] went." And it was only after explaining how Ms. Gardner's infidelities affected their marriage that he explained that there were other sources of "discontent" between them, such as disputes regarding their religion, income, and the division of responsibility within the marriage. This testimony suggests that the extramarital affairs were a significant cause of the divorce, even though there were other areas of contention in their marriage. Accordingly, the evidence supports the district court's conclusion that Ms. Gardner's extramarital affairs substantially contributed to the breakup of the marriage. And Ms. Gardner does not point to any other evidence that would contradict this.

¶ 37 The closest Ms. Gardner comes to contradicting Mr. Gardner's testimony is when she discusses his attempts to stay in

the marriage from the time he learned of the infidelities until 2016. She argues that the evidence suggests that her extramarital affairs played a "relatively minor role in the divorce" because Mr. Gardner stayed in the marriage for as long as he did.

¶ 38 In support, she points to the fact that Mr. Gardner had initially told their children that they were getting a divorce in 2007 after the first episode of infidelity, but that he "reconsidered" because Ms. Gardner "agreed to go through the repentance process at their church." She also points to the fact that, despite her affair, "he tried to help her, 'absolutely,' [by] seeking help from a psychiatrist and staging an intervention with the help of friends [and] by sending her from Arizona to Park City for a few days 'to collect herself.'" But rather than contradict Mr. Gardner's testimony that the extramarital affairs harmed the marriage, this additional testimony further corroborates it. The fact that he considered divorce after the first affair in 2007 and sought to find her "help" indicates that Mr. Gardner viewed his wife's infidelity as having significantly damaged their marriage. And this conclusion is not undermined by the fact that he agreed to remain in the marriage once she agreed to go through a formal repentance process through their church.

¶ 39 In fact, other comments he made regarding his decision to remain in the marriage confirm how damaging her extramarital affairs were. He testified that his decision was a "tough" one in light of her "multiple episodes of infidelity," and that even though he "really tr[ied] to hang on" he "sort of knew that it was probably the end." So Mr. Gardner's decision to not get divorced immediately upon learning of her extramarital affairs does not suggest that the affairs were an insubstantial factor in the marriage's eventual breakup.

¶ 40 Ms. Gardner also points to Mr. Gardner's testimony that he "was very committed to [the] relationship forever except for some of the egregious things that took place" to suggest that her affairs were not significant. But the most reasonable interpretation of this comment is that Mr. Gardner was very committed *until* Ms. Gardner made the "egregious" decision to engage in an extramarital affair.[25]

---

[25] Mr. Gardner's very next statement after saying that he was committed except for the egregious things that took place clarifies that the egregious things he was referring to were Ms. Gardner's "multiple episodes of infidelity."

So, once again, the evidence Ms. Gardner cites to attack the court's findings actually supports them.

¶ 41 Finally, Ms. Gardner points to the events surrounding an accident she suffered in 2016 to suggest that this incident, and not the previous affairs, was the true cause of the divorce. She claims that the parties "had a pretty good blowup," and that this was the true end of their marriage. But the events surrounding the accident are significant only when viewed in the context of Ms. Gardner's extramarital sexual affairs in 2007 and 2009.

¶ 42 The evidence on record reasonably supports the conclusion that Ms. Gardner's affairs in 2007 and 2009 triggered the "blowup" in 2016. After the affairs, Mr. Gardner agreed to remain in the marriage for a time.[26] But in 2016, Mr. Gardner discovered that Ms. Gardner had entered into an "inappropriate relationship" with the man with whom she had been on the day of her accident. Although Mr. Gardner admitted that this relationship had not yet become physical, he testified that Ms. Gardner had said that the man "wanted to take it further."

¶ 43 Mr. Gardner testified that this discovery was "the final nail" and "the end." And it was around this time that the parties had their "blowup"—the event that Ms. Gardner suggests was the true cause of the divorce. Several months later Mr. Gardner formally filed for divorce. So even though Ms. Gardner's affairs in 2007 and 2009 did not immediately end the divorce, the evidence supports the district court's conclusion that they were significant factors in the eventual "blowup" that precipitated the ultimate end of the marriage.

¶ 44 In sum, the phrase "substantially contributed" in section 30-3-5(8) should be interpreted as referring to conduct that was a significant or important cause of the breakup of the marriage. Under this interpretation, the conduct need not be the only significant cause, or the first significant cause; instead, it need only be significant enough that a reasonable person would conclude that it was an important factor in the divorce. Because evidence supports the conclusion that Ms. Gardner's extramarital sexual relationships in 2007 and 2009 were significant factors in the ultimate demise of the couple's marriage, we cannot say that the district court clearly erred

---

[26] As Mr. Gardner was discussing the "tough" decision he made to "hang on" to their marriage, he explained that he did it to provide "stability" for his children.

when it found that the affairs substantially contributed to the breakup of the marriage.

## II. We Affirm the District Court's Determination of the Terms of the Alimony Award

¶ 45 Next we must consider whether the district court committed reversible error in establishing the terms of the alimony award. As we have explained, we will disturb a district court's determination in a divorce proceeding only if (1) "there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error";[27] (2) the factual findings upon which the award was based are "clearly erroneous";[28] or (3) the party challenging the award shows that "such a serious inequity has resulted as to manifest a clear abuse of discretion."[29]

¶ 46 In this case, Ms. Gardner does not challenge the factual findings underlying the terms of the district court's alimony award. Instead, she argues that the court misapplied the law in establishing the terms of the alimony award because it did not seek to achieve "the first two 'primary aims of alimony'": (1) to get the parties as close as possible to the same standard of living that existed during the marriage and (2) to equalize the standards of living of each party. Additionally, she argues that the alimony award, when the totality of its terms are considered, constitutes an abuse of discretion because it resulted in "harsh punishment." Because the plain language of the alimony statute authorized the district court to depart from the default aims of alimony, and because the resulting alimony award did not create such a serious inequity as to manifest a clear abuse of discretion, we decline to disturb the district court's alimony determination.

---

[27] *Goggin v. Goggin*, 2013 UT 16, ¶ 44, 299 P.3d 1079 (citation omitted) (internal quotation marks omitted).

[28] *Dahl v. Dahl*, 2015 UT 79, ¶ 121, ---P.3d---; *see also id.* ("[W]e give due regard to the district court's superior position from which to judge the credibility of witnesses.").

[29] *Goggin*, 2013 UT 16, ¶ 44 (citation omitted) (internal quotation marks omitted).

*A. The district court was not required to base Ms. Gardner's alimony award on the standard of living she enjoyed while married, nor to equalize her and Mr. Gardner's standards of living*

¶ 47 The district court was not required to base Ms. Gardner's alimony award on the standard of living she enjoyed while married, nor to equalize her and Mr. Gardner's standards of living. Although courts should begin each alimony determination by considering the parties' respective economic circumstances with the aim of equalizing their post-divorce standards of living as nearly as possible to the standard of living they enjoyed while married, both our caselaw and the language of the alimony statute demonstrate that courts may depart from these default rules where necessary to achieve a fair and equitable result between the parties.

¶ 48 Our caselaw makes clear that the "overarching aim of a property division, and of the decree of which it and the alimony award are subsidiary parts, is to achieve a fair, just, and equitable result between the parties."[30] To that end, we have stated that courts should seek to divide property and award alimony in a way that avoids "perpetuation of the difficulties that brought failure to the marriage."[31] In other words, a property division and alimony award should "minimize animosities" and help the parties move on with their separate lives after divorce.[32]

¶ 49 To achieve these general aims, we have adopted a number of default rules to guide district courts. For example, we have held that alimony awards should be made with the purpose of "provid[ing] support for the [receiving spouse] as nearly as possible at the standard of living [he or] she enjoyed during marriage, and to prevent the [spouse] from becoming a public charge."[33] And we have stressed that "to the extent possible" the court should "equalize the parties' respective standards of living."[34] These rules tend to further

---

[30] *Dahl*, 2015 UT 79, ¶ 25 (citation omitted) (internal quotation marks omitted).

[31] *Wilson v. Wilson*, 296 P.2d 977, 979 (Utah 1956).

[32] *Id.* (explaining that a fair determination "let[s] the dead past bury its dead," so to speak).

[33] *Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985) (citation omitted) (internal quotation marks omitted).

[34] *Gardner v. Gardner*, 748 P.2d 1076, 1081 (Utah 1988). We note that equalization is a proper aim in an alimony determination only

(Continued)

the aim of "avoid[ing] perpetuation of the difficulties that brought failure to the marriage"[35] because they put the parties in the best possible position to "reconstruct their [separate] lives on a happy and useful basis."[36]

¶ 50  But in some situations the application of the default rules will not lead to the most equitable result.[37] When this is the case, courts have the discretion to deviate from them. For example, in *Riley v. Riley*, the Utah Court of Appeals upheld an alimony award to the wife that was "well above" her demonstrated monthly need.[38] In that case, a husband challenged the alimony award amount because it exceeded the amount needed to sustain the wife at the appropriate standard of living. But the court rejected this argument in light of the husband's fault in causing the divorce.[39] It explained that "even though such an award would be too high if only economic factors were considered," in light of the husband's fault, fairness to the wife could be achieved only by considering the husband's fault as a factor in setting the amount of the alimony award.[40] Thus the decision in *Riley* helps underscore the principle that where one party's fault harmed the other party, the court may consider that fault as it attempts to balance the equities in order to achieve the ultimate aim

---

where "the parties' combined resources do not stretch far enough" to support "two households rather than one" at the standard of living the parties enjoyed during the marriage. *Rule v. Rule*, 2017 UT App 137, ¶ 20, 402 P.3d 153. In other words, where there is more than enough money to support both spouses at the marital standard of living, the surplus need not be divided equally. But where there is a shortfall, the court should attempt to equalize the burden caused by that shortfall between the parties in a fair and equitable manner. *Id.* ¶ 21.

[35] *Wilson*, 296 P.2d at 979.

[36] *Id.*

[37] *See id.* at 979 (explaining that "no firm rule can be uniformly applied in all divorce cases, and that each must be determined upon the basis of the immediate fact situation").

[38] 2006 UT App 214, ¶ 19, 138 P.3d 84.

[39] *Id.* ¶ 23.

[40] *Id.* ¶¶ 23–24.

in an alimony determination—to achieve "a fair, just, and equitable result between the parties."[41]

¶ 51 Similarly, in *Wilson v. Wilson*, we considered a district court's decision to award alimony for a period of eight and one-third years after a fifteen-year marriage.[42] In that case, the district court concluded that even though the wife's lack of work experience caused the court to be "apprehensive" for her "welfare," it determined that alimony for the full length of the marriage was not appropriate due to "the attitudes of the parties."[43] Because of their attitudes, the court believed that "requiring [the husband] to carry the burden of permanent alimony would lead to 'almost [unbearable] bitterness.'"[44] In other words, the district court determined that a lengthy alimony award would not further the aim of putting the parties in the best possible position to "reconstruct their [separate] lives on a happy and useful basis."[45]

¶ 52 But the husband in *Wilson* appealed the district court's alimony award. According to the husband, the shortened duration of the alimony award was not short enough. We agreed. Although we recognized that the district court has considerable latitude in setting the terms of alimony, we held that the award did "not conform to the design the trial judge was avowedly trying to fashion of imposing an obligation upon [the husband] to pay a modest amount of alimony for a definite period of time and with a termination date in sight."[46] For that reason, we reduced the duration of the award by half.[47] So the decision in *Wilson*, like the decision in *Riley*, stands for the principle that where strict application of the normal alimony guidelines would not further the court's aim of achieving a fair, just, and equitable result between the parties it is appropriate to deviate therefrom.

---

[41] *Dahl*, 2015 UT 79, ¶ 25 (citation omitted) (internal quotation marks omitted).

[42] *Wilson*, 296 P.2d at 980–81.

[43] *Id.* at 980.

[44] *Id.*

[45] *Id.* at 979.

[46] *Id.* at 981.

[47] *Id.*

¶ 53 These principles were codified in Utah Code section 30-3-5(8). Section 30-3-5(8)(a) requires district courts to consider the financial situations of both spouses as part of its alimony determination.[48] Additionally, section 30-3-5(8)(e) urges district courts to "look to the standard of living, existing at the time of separation, in determining alimony in accordance with Subsection (8)(a)," and section 30-3-5(8)(f) provides that the "court may . . . attempt to equalize the parties' respective standards of living." Together these provisions codify the default rules that an alimony award should be crafted to "provide support for the [receiving spouse] as nearly as possible at the standard of living [he or] she enjoyed during marriage,"[49] and, "to the extent possible," to "equalize the parties' respective standards of living."[50]

¶ 54 As we have explained, these default rules tend to further the court's aim of achieving "a fair, just, and equitable result between the parties"[51] because they typically put the parties in the best possible position to "reconstruct their [separate] lives on a happy and useful basis."[52] So the economic factors, and the general aim of placing the parties in the same position they enjoyed during the marriage, stand as an important starting point in any alimony determination.

¶ 55 But section 30-3-5(8) also provides courts the flexibility and discretion to depart from these default rules in certain situations where fairness demands. For example, in addition to the economic factors listed in section 30-3-5(8)(a), section 30-3-5(8)(b) also authorizes courts to consider "the fault of the parties in determining

---

[48] UTAH CODE § 30-3-5(8)(a) (requiring courts to consider the recipient spouse's financial conditions, needs, and earning capacity; the payor spouse's ability to provide support; the length of the marriage; whether the recipient spouse has custody of minor children; and other economic considerations).

[49] *Jones*, 700 P.2d at 1075 (citation omitted) (internal quotation marks omitted).

[50] *Gardner*, 748 P.2d at 1081.

[51] *Dahl*, 2015 UT 79, ¶ 25 (citation omitted) (internal quotation marks omitted).

[52] *Wilson*, 296 P.2d at 979; *see also id.* (explaining that an alimony award should help the parties "avoid perpetuation of the difficulties that brought failure to the marriage").

whether to award alimony and the terms of the alimony."[53] So the statute expressly provides district courts with the discretion to consider fault in determining whether to award alimony, as well as in determining the terms—the amount and length—of the alimony award.

¶ 56   Section 30–3–5 also provides guidance for how a court may adjust the amount and length of an alimony award in the event the court determines that one spouse's fault necessitates a departure from the default economic alimony factors. For example, although section 30-3-5(8)(e) urges district courts as "a general rule," to "look to the standard of living, existing at the time of separation," it also instructs courts to "consider all relevant facts and equitable principles," and grants courts "discretion" to "base alimony on the standard of living that existed at the time of trial." When section 30-3-5(8)(e) is read together with section 30-3-5(8)(b)'s fault provision, it is clear that where a court determines that one spouse's fault would make it inequitable to maintain both parties at the standard of living enjoyed during the marriage, the court has the discretion to lower the award to an amount sufficient to sustain the at-fault spouse at a reasonable standard of living post-marriage, rather than the standard of living the couple enjoyed during the marriage.

¶ 57   Similarly, section 30-3-5(8)(f) authorizes courts to depart from default alimony awards where fault contributed to the break-up of the marriage. It instructs courts to "attempt to equalize the parties' respective standards of living." But it also notes that courts should do so only "under appropriate circumstances." So once again, when this provision is read together with section 30-3-5(8)(b)'s fault provision, it is clear that courts need not attempt to equalize the parties' respective standards of living where one spouse's fault would make equalization inappropriate.[54]

---

[53] In *Riley*, the court of appeals relied upon this provision in setting an alimony award at an amount that would have been "too high if only economic factors were considered." 2006 UT App 214, ¶ 23.

[54] Additionally, we note that it would not be appropriate to equalize the parties' respective standards of living where doing so would result in an alimony award to the receiving spouse that exceeds the estimated expenses of maintaining that spouse at the marital standard of living.

¶ 58 Therefore, under the plain language of section 30-3-5(8), courts have discretion to depart from the default economic rules where one party's fault makes it appropriate to do so. Because the district court determined that Ms. Gardner's conduct qualified as fault under the statute, the court was authorized to depart from the default alimony rules by reducing Ms. Gardner's alimony award by some amount.

*B. The district court's reduction of Ms. Gardner's alimony award did not constitute an abuse of discretion*

¶ 59 Although we conclude that the district court's fault determination authorized it to consider fault as part of its alimony determination, we must also determine whether the *manner* in which the court factored Ms. Gardner's fault into the alimony award constituted an abuse of discretion in this case. Ms. Gardner argues the court erred in disproportionately reducing her alimony award, because in her view, the "fault [in this case] was at most a minor piece of the failure of the marriage." We ultimately disagree with Ms. Gardner on this point, but her argument highlights a need to clarify the manner in which district courts may rely on fault in establishing the terms of an alimony award.

¶ 60 As we have explained, conduct listed in section 30-3-5(8)(c) may constitute fault even though it is not necessarily the only, or even the most important, factor in the breakup of the marriage. But courts should also recognize that not all conduct qualifying as fault under section 30-3-5(8)(c) should be given equal weight in alimony determinations. So where the fault of the parties is at issue, courts must make a threshold determination of whether the alleged conduct qualifies as fault under section 30-3-5(8)(c). And where the court determines conduct does qualify, it must then determine the role the fault should play in the alimony calculation.

¶ 61 In so doing, courts should keep in mind that the ultimate purpose of any property division or alimony award is to "achieve a fair, just, and equitable result between the parties."[55] For this reason, courts should consider fault only in an attempt to balance the equities between the parties. In other words, where one party's fault has harmed the other party, the court may attempt to re-balance the

---

[55] *Dahl*, 2015 UT 79, ¶ 25 (citation omitted) (internal quotation marks omitted).

equities by adjusting the alimony award in favor of the party who was harmed by that fault.[56]

¶ 62 Because courts should consider fault only to prevent or rectify an inequity to the not-at-fault spouse, courts must necessarily make detailed factual findings regarding the harmful effect of the fault. This is because the gravity of the harm caused by a party's fault will differ from case to case. The gravity of the harm may depend upon the nature of the conduct, the effect of the at-fault party's conduct on the marriage and the other party, and on other equitable factors.

¶ 63 So we hold that before a court considers fault as part of its determination, it must make a threshold determination, under section 30-3-5(8)(c), that the conduct qualifies as fault. It should then make detailed findings regarding the gravity of the harm caused by the fault. In making these findings, the court should focus on the

---

[56] We note that some Utah courts have struggled to articulate an appropriate role of fault in alimony determinations in light of our case law suggesting that the purpose of alimony is not to punish. *See Mark v. Mark*, 2009 UT App 374, ¶ 17, 223 P.3d 476 ("[I]f a trial court uses its broad statutory discretion to consider fault in fashioning an alimony award and then, *taking that fault into consideration*, adjusts the alimony award upward or downward, it simply cannot be said that fault was not used to punish or reward either spouse by altering the award as a consequence of fault."). But other Utah courts have concluded that fault may be considered without constituting punishment if it is used only to rectify the inequity caused by the fault. *See Christiansen v. Christiansen*, 2003 UT App 348, 2003 WL 22361312 at *2 ("Fault may correctly be considered by the trial court without penalizing the party found to be at fault."); *see also Wilson*, 296 P.2d at 980 (explaining that equitable factors often cause courts to impose permanent alimony on "erring" spouses); *Riley*, 2006 UT App 214, ¶ 24 (affirming the district court's consideration of a husband's fault as an important "factor in fairness to [Wife]" (alteration in original)). As this latter line of cases suggests, fault may be considered as long as it is used as a basis to prevent or rectify an inequity to the not-at-fault spouse. So in reviewing an alimony determination involving fault, Utah appellate courts should focus on whether a fault-based modification of an alimony award helped "achieve a fair, just, and equitable result between the parties" rather than on whether it was punitive in nature. *Dahl*, 2015 UT 79, ¶ 25 (citation omitted) (internal quotation marks omitted).

harm the at-fault conduct caused to the marriage[57] and the other party, along with other equitable factors. The court should then articulate the extent to which these findings justify a departure from the default rules of alimony.[58]

¶ 64 We note, however, that where a district court has made sufficient factual findings related to the gravity of fault, it has broad discretion in determining the manner in which fault factors into a "fair, just, and equitable" alimony determination in a given case. This is because the ultimate determination of how fault should be factored in will be based on broad equitable principles. And broad equitable principles do not lend themselves to the precise legal standards typically considered as part of an appellate review.

¶ 65 Accordingly, once we have determined that a court correctly applied section 30-3-5(8)(c) in determining whether conduct qualifies as fault, we will not disturb the court's alimony determination unless the factual findings underlying the determination are insufficient or clearly erroneous, or the resulting alimony award causes such serious inequity as to manifest a clear abuse of discretion.[59]

¶ 66 In this case, the district court properly applied section 30-3-5(8)(c) in determining that Ms. Gardner's conduct constituted fault. As part of this determination, the court also made

---

[57] We emphasize that in considering the harm or effect at-fault conduct had on the marriage, a court should determine the degree to which fault caused the disruption of the marriage. This is an important consideration because not all conduct meeting the threshold standard for fault under the statute will equally contribute to the demise of the marital relationship.

[58] Without such findings, it will be difficult for an appellate court to determine whether the district court's ultimate alimony determination was within its discretion.

[59] Once again we note that we will disturb a district court's alimony determination only if (1) "there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error," *Goggin*, 2013 UT 16, ¶ 44 (citation omitted) (internal quotation marks omitted); (2) the factual findings upon which the award was based are "clearly erroneous," *Dahl*, 2015 UT 79, ¶ 121; or (3) the party challenging the award shows that "such a serious inequity has resulted as to manifest a clear abuse of discretion." *Goggin*, 2013 UT 16, ¶ 44 (citation omitted) (internal quotation marks omitted).

numerous findings regarding the effect Ms. Gardner's fault had on the marriage, on Mr. Gardner, and on the unfairness of awarding alimony without making a fault-based reduction. After reviewing these findings, we cannot say that they are insufficient or clearly erroneous.

¶ 67 The district court found that Ms. Gardner's extramarital affairs seriously harmed the marriage and Mr. Gardner. For example, the court found that the extramarital affairs were the only "reasonable explanation as to why th[e] marriage fell apart," and that they "seem[ed] to have driven Mr. Gardner to file for this divorce." These statements indicate that the district court viewed Ms. Gardner's conduct as having had a profound, decisive effect on the parties' marriage.

¶ 68 The court also made findings regarding the effect of Ms. Gardner's conduct on the fairness of an alimony determination based on the default rules. The court explained it would be "unfair" to obligate Mr. Gardner to provide "a large support payment" that would allow Ms. Gardner "to continue living in a[n] affluent life-style" when it had been her conduct that caused "the break up of the marriage partnership." Later on, the court reiterated this reasoning, stating that it was "not going to penalize Mr. Gardner for something that really did not appear . . . [to be] his fault." Based on these equitable principles, the court determined it would be fair to reduce Ms. Gardner's expected standard of living from "affluent" to "very comfortable." Thus the court made findings regarding the gravity of harm caused by Ms. Gardner's fault, and it explained how that fault would affect its alimony determination.

¶ 69 Importantly, Ms. Gardner does not challenge the factual findings underlying the court's alimony reductions. For example, the court found that even though it was reducing her housing expenses from $2,445 per month to $1,600 per month, she would nevertheless be able to afford a "modest" home in a less expensive area or a "three bedroom apartment" in the affluent neighborhood in which she was currently living. Ms. Gardner does not argue that the amount provided for housing expenses will be insufficient for the purchase of such a home or the rental of a three bedroom apartment. She likewise does not challenge the court's other fault-based reductions.

¶ 70 Instead, Ms. Gardner seems to challenge only the court's characterization of the gravity of her fault. In other words, she argues that the court clearly erred when it determined that the nature of her conduct justified it in not providing her with sufficient alimony to

continue living in a home that is roughly as expensive as her marital home.

¶ 71   But we are not convinced that the court's characterization of her fault is clearly erroneous. Although it is conceivable that the court could have made more detailed factual findings regarding the relative gravity of the fault at issue in this case, there is sufficient support in the record to conclude that her extramarital affairs were severely damaging. Mr. Gardner testified that he considered her affairs to be "egregious," and that they were a key factor in the divorce.[60] Accordingly, the court's findings regarding the gravity of harm caused by Ms. Gardner's conduct—that it was the primary impetus of the divorce—are not clearly erroneous.

¶ 72   And when we consider the effect of the specific alimony reductions, we also cannot say that they resulted in such serious inequity as to manifest a clear abuse of discretion. Ms. Gardner argues that the court abused its discretion in four ways: (1) by reducing her need by "nearly one-third," (2) by "shorten[ing] the alimony award from the statutory length of the marriage (here, 22 years) to only ten," (3) by providing for a gradual decrease in the alimony amount over the final years of the award, and (4) by imputing to her an income of $1,300. But because Ms. Gardner has not shown that these reductions resulted in such serious inequity as to manifest a clear abuse of discretion, we must uphold the district court's alimony determination.

1. The district court's reduction of Ms. Gardner's expected monthly expenses did not result in such serious inequity as to manifest a clear abuse of discretion

¶ 73   The district court did not abuse its discretion in reducing Ms. Gardner's expected monthly expenses. The court reduced Ms. Gardner's expected monthly expenses "to reflect reasonable and necessary expenses for a person in her circumstances" because it did not believe it was fair to obligate Mr. Gardner to maintain Ms. Gardner at the standard of living she enjoyed during her marriage. The court reduced her expected monthly expenses in three ways.

---

[60] *See* UTAH R. CIV. P. 52(a)(4) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses.").

¶ 74 First, the court reduced the amount of her expected housing expenses from $2,445 per month to $1,600 per month. It explained that $1,600 "should be an adequate amount, particularly given . . . the large settlement that's coming out of the sale of the house." According to the court, this amount would allow Ms. Gardner "to purchase a modest home, probably on the west side of the freeway rather than in [her former neighborhood], or to rent a three bedroom apartment [in that neighborhood]." Because she would likely be living in a smaller home, the court reduced her expected utility bills to $75 per month for electricity and $50 per month for gas.

¶ 75 Second, the court reduced the amount of an expected automobile loan from $533 to $250. It explained that "given the goal is not equalization," it was reasonable to provide her with an amount sufficient to purchase "a smaller more fuel efficient car" rather than the more expensive SUV she had requested. The court also reduced her expected gasoline expenses because it believed she could "find a car that gets better than 12 or 13 miles to the gallon."

¶ 76 Finally, the court declined to include any expenses for education because there was "no evidence . . . that during the course of the marriage or even during the course of the separation that Ms. Gardner ha[d] sought educational opportunities that require payment."[61] After making these downward adjustments, the court estimated Ms. Gardner's monthly expenses to be $5,437 per month—a reduction of $1,513 per month from her reasonably expected monthly expenses during marriage.

¶ 77 Although Ms. Gardner attempts to portray these adjustments in drastic terms, she fails to persuade us that the court acted unreasonably or that she has suffered a serious inequity. Section 30-3-5(8) authorizes courts to consider fault in deciding whether to depart from the goal of equalizing the parties' respective standards of living at the standard of living they enjoyed during the marriage. And once a court decides to base a party's alimony award on a lower standard of living than he or she enjoyed during marriage, it will inevitably have to reduce that party's expected monthly expenses. In practice, this will require the court to reduce the costs of specific line items in that person's budget. That is what the court did in this case.

---

[61] The court noted, however, that if Ms. Gardner wished to pursue education opportunities in the future, there would be "ways of obtaining financing for [education] outside of alimony."

¶ 78   Because the court was authorized, under section 30–3–5(8), to reduce Ms. Gardner's standard of living, and Ms. Gardner has not demonstrated that the reduced standard of living results in serious inequity, we hold that the court did not abuse its discretion in reducing Ms. Gardner's expected monthly expenses.

2. The district court's reduction of the duration of Ms. Gardner's award did not constitute an abuse of discretion

¶ 79   Similarly, we hold that the district court did not abuse its discretion in reducing the duration of Ms. Gardner's alimony award. Ms. Gardner argues the district court abused its discretion in awarding alimony for a period of ten years rather than the statutory maximum of twenty-two years. It did not.

¶ 80   Utah code section 30-3-5(8)(j) states that alimony "may not be ordered for a duration longer than the number of years that the marriage existed." So, under the statute, a twenty-two year alimony award was the *maximum* amount for which alimony could be awarded. Importantly, nothing in the statute bars "an award for a shorter duration."[62] For this reason "an alimony award for shorter than the term of the marriage [should] be upheld unless it results in a serious inequity evidencing an abuse of . . . discretion."[63]

¶ 81   Utah courts regularly uphold alimony awards for periods shorter than the term of the marriage.[64] For example, in *Warren v. Warren*, we upheld a four-year alimony award despite the couple having been married for close to thirty years.[65] In that case the receiving spouse argued the alimony award was insufficient in amount and duration because she had "no previous work experience and . . . she suffer[ed] a 'medical disability of the hands.'"[66] But we

---

[62] *Jensen v. Jensen*, 2008 UT App 392, ¶ 16, 197 P.3d 117.

[63] *Id.*

[64] *See Warren v. Warren*, 655 P.2d 684, 688 (Utah 1982) (affirming an alimony award for a four-year period after a twenty-seven year marriage); *Jensen*, 2008 UT App 392, ¶ 20 (affirming an alimony award for a five-year period after a sixteen-year marriage); *Davis v. Davis*, 2003 UT App 282, ¶¶ 4, 10, 76 P.3d 716 (affirming an alimony award for a ten-year period after a thirty-five year marriage); *Childs v. Childs*, 967 P.2d 942, 947 (Utah Ct. App. 1998) (affirming a temporary alimony award after a five–year marriage).

[65] *Warren*, 655 P.2d at 688.

[66] *Id.*

rejected the receiving spouse's argument because "no evidence in the record show[ed] [the spouse] to be unemployable," "she presented no testimony or other evidence to show any impairment of the use of her hands," and "the record [did not] disclose any other circumstance which might prevent [the spouse] from acquiring employable skills."[67] For these reasons, we concluded that the alimony award of four years "ensure[d] ample time for the acquisition of [sufficient] skills prior to the termination of alimony."[68]

¶ 82 Thus, our caselaw makes clear that district courts may award alimony for a period shorter than the length of the marriage. Our only task on appeal, therefore, is to ensure that the shortened terms of an alimony award do not result in "a serious inequity" to one of the parties.[69]

¶ 83 With this goal in mind we have previously held that it is an abuse of discretion to award alimony for a shortened period when it is unlikely the receiving spouse would be able to maintain the same standard of living after the alimony period ended.[70] Thus, before ordering an alimony award of an overly short duration, appellate courts often require district courts to demonstrate that the recipient spouse can "close the gap between actual expenses and actual income" and thereby support him or herself when the alimony period ends.[71]

¶ 84 Importantly, the length of an alimony award, on its own, can be a deciding factor in demonstrating whether the receiving spouse will be able to close the gap between expenses and actual income. For example, in *Jensen v. Jensen*, the court of appeals affirmed

---

[67] *Id.*

[68] *Id.*

[69] *Jensen*, 2008 UT App 392, ¶ 16.

[70] *See Jones*, 700 P.2d at 1076 (holding that a shortened, "rehabilitative" award "was inequitable" where the wife was "in her mid-50's, possesse[d] few marketable job skills, and ha[d] little hope of retraining"); *Mark*, 2009 UT App 374, ¶ 15 (reversing an alimony award where the recipient spouse was fifty-two years old, the parties had been married for twenty-five years, the recipient spouse's earning capacity was a fraction of the breadwinner's earning capacity, and the recipient spouse had weak employment prospects).

[71] *Mark*, 2009 UT App 374, ¶ 12 (citation omitted) (internal quotation marks omitted).

an alimony award for a five-year-period after the end of a sixteen-year marriage.[72] As Ms. Gardner argues in this case, the receiving spouse in *Jensen* contended that "her advanced age and her lack of significant work experience outside the home" made it necessary to award alimony equal to the entire length of the marriage.[73] And the spouse claimed that the district court had abused its discretion because "no evidence was presented to the trial court indicating that she 'had the necessary education or work skills to increase her income' within the five-year period so as to cover her monthly shortfall or that her circumstances would be any different in five years than at the time of trial."[74] But the court of appeals affirmed the alimony award because it concluded that five years provided the receiving spouse enough time to "put her house in order and be able to support herself."[75] This reasoning applies just as well to the facts of this case.

¶ 85   In this case, the court ordered the alimony to terminate in ten years and then stated it "want[ed] to give [Ms. Gardner] some incentive to start working and be able to be self sufficient." The court explained that "at that point [Ms. Gardner is] going to need to be in a position to be able to take care of herself and so it's important that she start getting some education or work experience." Because ten years provides Ms. Gardner a reasonable amount of time to pursue an education or work experience that would allow her to close the gap between expenses and actual income, the court did not err by ordering a ten-year alimony award.

¶ 86   Additionally, there is evidence on the record to suggest that Ms. Gardner should share some of the responsibility for her lack of work experience and marketable skills. Mr. Gardner testified that he frequently encouraged Ms. Gardner to gain work experience or obtain more education. But Ms. Gardner declined to do so. In *Warren*, we refused to place the burden of a wife's lack of work experience or marketable skills fully on a husband who had "encouraged [his wife] to finish work on her baccalaureate degree and to find a job, [even though the wife] had not done so."[76] As the court found in *Warren*,

---

[72] 2008 UT App 392, ¶ 19.

[73] *Id.* ¶ 18.

[74] *Id.*

[75] *Id.* ¶ 19 (internal quotation marks omitted).

[76] 655 P.2d at 688.

evidence on the record in this case suggests that it would be unfair to impose the financial burden stemming from Ms. Gardner's lack of earning capacity fully upon Mr. Gardner. So this reason also supports the court's reduction.

¶ 87 Finally, even were we to assume that the length of the alimony award is inequitable when only economic factors are considered, the ten-year alimony period is justified by Ms. Gardner's statutorily recognized fault. Section 30-3-5(8)(b) allows district courts to consider fault in determining the terms of the alimony award. And we have previously recognized that fault may be considered in establishing the length of an alimony award.[77]

¶ 88 In this case, the district court expressly tied the shortened alimony duration to its finding of fault. It did not abuse its discretion in doing so. The court stated that it seemed unfair to impose a continuing burden of support on Mr. Gardner. Because it is reasonable to conclude that imposing an alimony award for twenty-two years upon Mr. Gardner, where it was Ms. Gardner's conduct that caused the divorce, would not be "fair, just, and equitable," we conclude that the court did not abuse its discretion in shortening the duration of the alimony period, even were we to assume that the duration is not justified solely by economic factors.[78]

¶ 89 In sum, the district court did not abuse its discretion in setting a ten-year alimony period, because (1) ten years reasonably provides Ms. Gardner with enough time to become self-sufficient, (2) Ms. Gardner shares at least some of the blame for her lack of marketable skills and work experience, and (3) even assuming the duration is not justified by economic factors alone, the shorter alimony period is equitable in light of Ms. Gardner's fault.

---

[77] *Wilson*, 296 P.2d at 980 ("[C]ourts have seen fit to impose upon the *erring* [spouse] the burden of *permanent* alimony." (emphasis added)).

[78] *See Riley*, 2006 UT App 214, ¶ 23 (explaining that a spouse's "fault goes a long way in explaining the propriety of a $900 per month alimony award, even though such an award would be too high if only economic factors were considered").

3. The district court did not abuse its discretion in establishing a gradual decrease in the alimony amount over the final years of the award

¶ 90   We also hold that the district court did not abuse its discretion by providing for a gradual decrease in the alimony amount over the final years of the award. Although Ms. Gardner admits that "stepdown awards, like shortened awards, are not per se inappropriate," she argues that this step-down award is inappropriate because it "does not allow [her] to meet her needs." Because there is evidence on record that the terms of the alimony award will allow Ms. Gardner to become self-sufficient before the alimony period expires, the court's implementation of the step-down feature does not constitute an abuse of discretion.

¶ 91   The district court awarded alimony to Ms. Gardner for ten years, with an incremental annual decrease after the minor children leave the home. The court suggested that Ms. Gardner use this time to "start getting some education or work experience." But Ms. Gardner argues that the district court's suggested ideas for how Ms. Gardner could become self-sufficient do not "recognize reality." Specifically, she argues that the evidence suggests she will not be able to get work experience, and the court did not structure her alimony amount to allow her to get an education. But Ms. Gardner fails to show that the court's suggestions are unsupported by the evidence.

¶ 92   The record includes evidence that Ms. Gardner could begin working and thereby get meaningful work experience during the ten-year alimony period. The district court found that "because of her position in life[,] and the fact she does have some skills[,] . . . she probably can find a job earning more than minimum wage." Ms. Gardner argues this is unrealistic because she "has only a high-school diploma and no meaningful job history." But the record suggests she has other marketable skills. Ms. Gardner testified to having earned money teaching swimming, piano, sewing, and art classes. Additionally, at times during the marriage she has earned sizeable commissions for her artwork, with the largest commission being $5,000 for two or three weeks of work.

¶ 93   Ms. Gardner argues, however, that there was not "any evidence that her health would allow her to work." But the burden at trial was on Ms. Gardner to provide evidence that her health would

*not* allow her to work.[79] And the district court determined that Ms. Gardner did not provide any evidence to suggest that she is incapable of working. In fact, the evidence indicates just the opposite. Ms. Gardner testified she had worked part-time earning $11.00 per hour before and after her accident. And she testified she would like to pursue teaching sewing and other art classes as a career because it is something she can do even with her health problems.

¶ 94 Ms. Gardner also argues that there is no evidence she can earn sufficient income because Mr. Gardner "did not enlist a vocational expert to testify to available jobs for which [Ms. Gardner] was qualified." But once again this argument fails because the burden was on Ms. Gardner to provide evidence that there were no viable career options.[80] And by providing Ms. Gardner with ten years of alimony, the court gave her sufficient time to find a viable career path.

¶ 95 Ms. Gardner also argues, in a single paragraph, that the court was not being realistic when it suggested that she pursue additional education, because it declined to consider her requested $675 per month for educational costs as part of her expected monthly expenses. But the court's decision to exclude these monthly expenses was based on the fact that "there was no evidence or testimony presented to the court that [Ms. Gardner] ha[d] been seeking educational opportunities that requir[e] payment."[81] Because Ms. Gardner has not explained what kind of educational opportunity she might pursue in the future, it is impossible to assess the cost of that education. Accordingly, the district court did not abuse its discretion by denying her request for additional education expenses.

---

[79] *Dahl*, 2015 UT 79, ¶ 95 (explaining that a "party seeking alimony bears the burden of demonstrating to the court that the [relevant alimony] factors support an award"); *see also Warren*, 655 P.2d at 688 (affirming the district court's determination that a wife's alleged physical impairment of her hands did not prevent her from working because "she presented no testimony or other evidence to show any impairment of the use of her hands").

[80] *Dahl*, 2015 UT 79, ¶¶ 95–98 (affirming the district court's decision to award no alimony because the wife had failed to demonstrate her financial need and earning capacity).

[81] The court's decision to exclude unsubstantiated expenses from its need calculation was fully within its discretion.

¶ 96 Additionally, it is important to note that the district court awarded Ms. Gardner half of the marital estate, an award that includes $153,000 for her half of the marital home; half the value of property in Driggs, Idaho; half the value of a promissory note for property in Summit County, Utah; and half the value of all "retirement, 401(k), investment, savings, IRA, and other similar accounts." With Ms. Gardner's sizeable share of the marital property in mind, it seems reasonable that she could afford to pursue an education under the terms of the alimony award. Additionally, the court included an allotment in her monthly expenses for a car payment, despite the fact that she received a 2007 Yukon Denali that was fully paid off. So, under the terms of the court's award, until Ms. Gardner purchases a new car, she has an extra $250 per month with which she could pursue an education.

¶ 97 Lastly, Ms. Gardner suggests that the court abused its discretion by suggesting that, if she is "indeed disabled," she could "seek income from a government or charitable disability program." But the court expressly determined that Ms. Gardner had not met her burden of establishing that she was disabled and it structured the alimony award accordingly. This comment by the district court, then, is most reasonably understood as the court's attempt to reassure Ms. Gardner that even were it incorrect in determining that she was not disabled, she would not be without recourse. Because there is evidence to support the court's determination that Ms. Gardner could work, and could become self-sufficient within the ten-year alimony period, the court did not abuse its discretion in including the step-down provision in the alimony award.

4. The district court did not err by imputing income to Ms. Gardner at $1,300 per month

¶ 98 Fourth and finally, Ms. Gardner argues that the district court erred by imputing "an arbitrary $1,300 per month [income], even while stating that she was not capable of working." "In divorce cases where there is insufficient evidence of one of the statutory alimony factors, courts may impute figures."[82] "The trial court in a

---

[82] *Id.* ¶ 116; *see also Connell v. Connell*, 2010 UT App 139, ¶¶ 14–20, 233 P.3d 836 (imputing husband's income from a prior job to determine his ability to pay alimony); *Leppert v. Leppert*, 2009 UT App 10, ¶ 12, 200 P.3d 223 (holding that the district court did not abuse its discretion in imputing an income figure for wife when the decision was "adequately supported" by the district court's findings).

divorce action is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity."[83] So a court's decision to impute income to a spouse, and its decision on the amount of income that ought to be imputed are each reviewed for an abuse of discretion.[84] A court does not abuse its discretion in imputing income to a spouse if the court determines that the spouse "is voluntarily unemployed or underemployed."[85] But we need not determine whether the district court erred on this point, because Ms. Gardner invited it to impute income at minimum wage.

¶ 99   "Under the invited error doctrine, we [may] decline 'to engage in plain error review when counsel made an affirmative statement that led the court to commit the error.'"[86] In this case, Ms. Gardner, through her counsel, made an affirmative statement that led the court to impute income at minimum wage level. On the last day of trial, Ms. Gardner's attorney stated that imputing income at minimum wage was "appropriate under the law and under the statute." Although it is unclear to which statute Ms. Gardner was referring, the most likely one is Utah Code section 78B-12-203, which provides the criteria for imputing income in the child support context. According to Utah Code section 78B-12-203(8)(c), a "parent may be imputed an income at the federal minimum wage for a 40-hour work week" if that "parent has no recent work history or a parent's occupation is unknown."[87] Thus Ms. Gardner's counsel invited the court to impute income pursuant to a statute that requires, as its default, a court to impute income at minimum wage for a forty-hour work week.

¶ 100  And it is clear that this invitation led the court to commit the alleged error. During trial the following day, the court indicated

---

[83] *Goggin*, 2013 UT 16, ¶ 44 (citation omitted) (internal quotation marks omitted).

[84] *Reese v. Reese*, 1999 UT 75, ¶ 17, 984 P.2d 987.

[85] *Rayner v. Rayner*, 2013 UT App 269, ¶ 7, 316 P.3d 455 (citation omitted) (internal quotation marks omitted).

[86] *State v. Ring*, 2018 UT 19, ¶ 20, 424 P.3d 845 (citation omitted).

[87] UTAH CODE § 78B-12-203(8)(c). This section also states that before a court may "impute a greater or lesser income, the [court] . . . shall enter specific findings of fact as to the evidentiary basis for the imputation."

it was imputing income at a minimum wage level based on Ms. Gardner's counsel's suggestion. Specifically, the court explained that its "notes . . . indicated that [Ms. Gardner's counsel] suggested imputing minimum wage was . . . a fair way to calculate things." The court then stated it was "going to impute income of $1,300 a month to [Ms. Gardner], which is a full-time minimum wage income." Ms. Gardner did not object to this number.[88]

¶ 101 Because Ms. Gardner conceded that imputing income at minimum wage was appropriate under the law, which states that income may be imputed at minimum wage for forty hours per week when there is no work history, and this concession led the court to impute income at minimum wage for forty hours per week, we, under the invited error doctrine, decline to address this issue.

### III. The District Court Did Not Plainly Err in Failing to Consider Ms. Gardner's Tax Burden

¶ 102 Ms. Gardner also argues that the court plainly erred in establishing the terms of alimony because it failed to consider taxes she must pay on alimony, and it applied her gross income rather than her net income to its calculations. To demonstrate plain error, an appellant must show "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful."[89] Although the court may have committed an error in this case, Ms. Gardner has failed to meet her burden of showing that the alleged error was harmful. Accordingly, we affirm the district court's alimony determination on this point.

¶ 103 An error is harmful where, "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant."[90] "The burden of showing such a likelihood rests on the

---

[88] On appeal, Ms. Gardner points out that $1,300 is technically not minimum wage, and she is correct on this point. Minimum wage at forty hours per week would come out to $1,256.67 per month. Because the difference—$43.33—is not significant, and there is evidence in the record to support an imputation of an amount greater than minimum wage, the imputation of $1,300 per month falls within the district court's range of discretion. *See Goggin*, 2013 UT 16, ¶ 44.

[89] *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (alteration in original) (citation omitted) (internal quotation marks omitted).

[90] *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (citation omitted) (internal quotation marks omitted).

complaining party."[91] Because Ms. Gardner has made no attempt to show that the court's failure to take taxes into consideration resulted in harm, she has failed to meet her burden on the error prong.

¶ 104  In Ms. Gardner's opening brief, her argument in support of a finding of harm is limited to a single sentence: "Here, the error is harmful [because] paying taxes further reduces [my] ability to meet [my] need." But she never states what the resulting tax consequences of the court's alleged error are nor what they would have been had the district court fully considered the tax implications of the alimony award. As Mr. Gardner points out in his response brief, Ms. Gardner's failure to provide this information is fatal to her argument.

¶ 105  According to Mr. Gardner, her effective tax bracket, and the tax deductions available to her, make it "more than likely [that she would] have no tax liability." Although Ms. Gardner, in her reply brief, attempts to rebut this argument by suggesting that Mr. Gardner's calculations are incorrect or speculative, she once again makes no effort to explain what the actual tax consequences of the court's error are or what they would have been had the court considered the tax implications of its award. So Ms. Gardner fails to satisfy her burden of showing that the court's failure to consider the tax burden of her alimony award was harmful.

¶ 106  Additionally, Ms. Gardner also fails to satisfy her burden of persuasion regarding the court's alleged error in applying a gross imputed income rather than a net one. Mr. Gardner argues that she failed to satisfy her burden because it is not clear whether the district court intended the imputed income of $1,300 to be her gross or her net income. And he argues that even if the income was intended to be her gross income, the resulting reduction in her income would have been so slight as to be well within the court's discretion. We agree for two reasons.

¶ 107  First, the district court never indicated whether the imputed income was intended to be her gross or net income. Because marital property distributions are "entitled to a presumption of validity" in the divorce context, we need not assume the court incorrectly intended the imputed amount to represent her gross income.[92] Second, Ms. Gardner does not address either of

---

[91] *State v. Arguelles*, 2003 UT 1, ¶ 94, 63 P.3d 731.

[92] *Goggin v. Goggin*, 2013 UT 16, ¶ 44, 299 P.3d 1079 (citation omitted) (internal quotation marks omitted).

Mr. Gardner's arguments nor does she make any attempt to support her conclusory statement that the alleged error harmed her. So there is nothing to support her allegation that she was harmed by the court's alleged error.

¶ 108  Because Ms. Gardner has failed to show that the court's alleged errors were harmful, we affirm the district court on this point.

IV. We Affirm the District Court's Attorney Fee Decision

¶ 109  Finally, Ms. Gardner argues the district court abused its discretion by declining to award her attorney fees pursuant to Utah Code section 30-3-3, which states that "in any action to establish an order of . . . alimony . . . , the court *may* order a party to pay the costs, attorney fees, and witness fees, including expert witness fees, of the other party to enable the other party to prosecute or defend the action."[93] "The decision of whether to award attorney fees pursuant to section 30-3-3 of the Utah Code rests in the sound discretion of the district court."[94]

¶ 110  Ms. Gardner argues the district court abused its discretion in declining to award attorney fees because there were "insufficient factual findings" to support its decision. We disagree.

¶ 111  The district court's attorney fee determination was supported by sufficient evidence. The court stated that its denial of Ms. Gardner's attorney fee request was "based in part" on the fact that it was "aware that there is substantial payment coming out of the home that should be sufficient to be able to pay for attorney's fees and leave plenty to be able to purchase a new home with." Ms. Gardner argues that this finding is insufficient because "the alimony award ensures that [Ms. Gardner's] and [Mr. Gardner's needs] are grossly disproportionate."

¶ 112  But this argument misconstrues the language of section 30-3-3, which authorizes a district court to award attorney fees in order to "enable the [non-paying] party to prosecute or defend the action." In this case, the court found that Ms. Gardner's property disbursement was "sufficient" to cover her legal expenses. This is supported by record evidence. As part of Ms. Gardner's property disbursement, she is expected to receive an estimated $153,000 from the sale of the parties' marital home. And at trial,

---

[93] UTAH CODE § 30-3-3(1) (emphasis added).

[94] *Dahl v. Dahl*, 2015 UT 79, ¶ 168, ---P.3d---.

Ms. Gardner estimated that her legal costs would be close to $25,000. Because the $153,000 payment would be more than sufficient to cover the estimated $25,000 in attorney fees she had incurred in litigating the divorce, the district court's decision declining to award attorney fees to Ms. Gardner is supported by the facts of the case. Accordingly, we affirm the district court's attorney fee determination.

## Conclusion

¶ 113 Because the district court did not abuse its discretion in determining Ms. Gardner's conduct constituted fault or in establishing the terms of her alimony award, we affirm the district court's alimony determination. Additionally, we hold that Ms. Gardner failed to establish that the district court's failure to consider relevant tax consequences constituted a harmful error. Finally, we affirm the district court's decision to decline to award attorney fees to Ms. Gardner because this decision was not an abuse of discretion.