**Marlin K. LOOSLE and Theresa L. Loosle, Plaintiffs and Appellants,**

v.

**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF LOGAN, Hillam Abstracting and Insurance Agency, trustee, All Pro Real Estate Incorporated, a Utah corporation, Quality Builders Incorporated, a Utah corporation, and William L. Packer dba Quality Builders, Defendants and Appellees.**

**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF LOGAN, Plaintiffs,**

v.

**Marlin K. LOOSLE and Theresa L. Loosle, Defendants.**

**No. 900534.**

Supreme Court of Utah.

Sept. 1, 1993.

Dale M. Dorius, Brigham City, for Loosles.

Miles P. Jensen, Logan, for First Federal Sav. & Loan, Hillam Abstracting and Ins.

HOWE, Associate Chief Justice:

Plaintiffs Marlin K. Loosle and Theresa L. Loosle appeal from adverse judgments entered against them in two cases which have been consolidated for the purposes of this appeal.

In the first action, plaintiffs brought suit against defendant First Federal Savings & Loan Association of Logan and defendant Hillam Abstracting and Insurance Agency for negligent misrepresentation of the value of real property purchased by plaintiffs and financed by First Federal. In 1980, plaintiffs agreed to purchase a house on 3.12 acres of land in the Harper Ward area, north of Brigham City, from defendant Quality Builders, Inc., for $89,900. They exchanged their equity in a house and lot they owned in Perry and agreed to pay the balance of $67,000 by borrowing on the Harper Ward property. Plaintiffs arranged for a loan of that amount from First Federal which was secured by a trust deed on which Hillam was the trustee. Plaintiffs did not obtain an appraisal of the property they were purchasing, but First Federal had an appraisal made for its internal purposes. It was appraised at $87,000. Plaintiffs had no knowledge of that appraisal at that time.

Plaintiffs made regular monthly payments on the promissory note, and in early 1988, they contacted First Federal about refinancing the property. As part of the refinancing process, First Federal obtained an appraisal valuing the property as of May 23, 1988, at $63,500. One month later, plaintiffs obtained a second appraisal, which fixed its value at $65,000. They then learned for the first time of the $87,000 appraisal made by First Federal in 1980. In August 1988, plaintiffs defaulted in their payments on the note. A nonjudicial foreclosure was instituted by the trustee, and First Federal purchased the property at the foreclosure sale for $63,500. Plaintiffs assert that First Federal negligently misrepresented the value of the property they were purchasing, relying in part on *Jardine v. Brunswick Corp.*, 18 Utah 2d 378, 423 P.2d 659 (1967), where we recognized causes of action for deceit even though the misrepresentation was not wilfully false. *See also Price–Orem Inv. Co. v. Rollins, Brown, & Gunnell,* 713 P.2d 55 (Utah 1986). Plaintiffs argue that because First Federal had an appraisal, it was in a superior position to know the value of the property and that the agreement to give plaintiffs a loan was a representation that the property was worth $87,000.

There are several problems with that argument. In the first place, plaintiffs cite no legal authority, and we have been unable to find any, which holds that an appraisal made by a lending institution in the course of making a loan secured by real property but not disclosed to the borrower is an implied representation as to the value of the property. Second, plaintiffs have proffered no evidence that the 1980 appraisal made by First Federal was faulty. They assert only that they made valuable and expensive improvements to the property after they purchased it and that real estate values in that area have generally increased since 1980. These general statements are inadequate to prove that the 1980 appraisal was inaccurate. Finally, before First Federal's appraisal was made, plaintiffs had already legally obligated themselves to purchase the property for $89,900. Therefore, it cannot be argued that they purchased the property in reliance upon an appraisal later made by First Federal. There was no error in the grant of summary judgment in favor of First Federal, and we affirm it.

▮ The second action was brought by First Federal against the Loosles, after First Federal acquired the property at the foreclosure sale, to quiet title to the water rights associated with the use of the property. The property has three springs on it. Two springs tend to be alkaline and have not been used for culinary purposes but simply to supply a pond. The third spring (called Loosle Spring) was the only source of culinary water when plaintiffs acquired the property. It was also used for irrigation purposes. The Loosles filed an application to appropriate this water in May 1988. Shortly after the Loosles occupied the property, they found this spring water unacceptable for drinking. The water tasted "brackish" whenever there was a heavy rain and during the summer months when water from a nearby ditch apparently contaminated the spring. Consequently, in 1982 the Loosles, together with two of their neighbors, the Thorpes and the Curtises, entered into a verbal agreement to jointly drill a well on property owned by the Curtises to serve all of their homes. The state engineer approved their application, and a well was successfully drilled. Thereafter, proof of appropriation was filed with the state engineer. The engineer had not yet issued a certificate of appropriation at the time of trial. The three parties piped the water from the well to each of their properties. This is now the only water which is useable year-round for culinary purposes on the Loosle property. The well water serves the property by gravity flow, requiring no pumping.

The trust deed executed by the Loosles contained a legal description of the real property being pledged as security for the loan, following which it was stated:

TOGETHER with *all the improvements now or hereafter erected* on the property, and *all easement, rights, appurtenances,* rents (subject however to the

rights and authorities given herein to Lender to collect and apply such rents), royalties, mineral, oil and gas rights and profits, *water, water rights,* and water stock, and all fixtures now or hereafter attached to the property, all of which, *including replacements and additions thereto, shall be deemed to be and remain a part of the property* covered by this Deed of Trust; and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a leasehold) are herein referred to as the "Property."

(Emphasis added.) The trial court concluded that whatever rights the Loosles had in Loosle Spring by virtue of the application filed with the state engineer in 1988 and whatever rights the Loosles had in the well pursuant to the approved application to appropriate were appurtenant to the land and passed to First Federal through the trust deed. Although we agree with this result, we disagree with the rationale that the water rights were appurtenant to the property.

■ Section 73-1-11 is the relevant statute regarding the transfer of water rights in Utah. That section provides in part, "A right to the use of water appurtenant to land shall pass to the grantee of such land ... provided, that any such right ... may be reserved by the grantor in such conveyance...." Utah Code Ann. § 73-1-11. The question of when water becomes appurtenant to land so that it passes to the grantee under section 73-1-11 was recently addressed by this court in *Little v. Greene & Weed Investment,* 839 P.2d 791 (Utah 1992). In that case, we had to determine whether a warranty deed conveying a property interest also conveyed the right to use water associated with that property. The language of the warranty deed conveyed the land "[t]ogether with all improvements and appurtenances appertaining thereto." However, at the time of the conveyance, the state engineer had not yet issued a certificate of appropriation covering the water used with the conveyed land. As a result, we held that the water right at issue was not transferred as an appurtenance. We concluded that water rights do not become appurtenant to land for purposes of section 73-1-11 until the certificate of appropriation is issued by the state engineer. The relevant statutes require the completion of certain steps before an official "water right" comes into existence. *See* Utah Code Ann. §§ 73-3-1 to -17. The initial step requires filing an application to appropriate water. § 73-3-1. The state engineer must then approve the application, giving the applicant the authority to proceed and perfect the appropriation by applying the water to beneficial use. § 73-3-8. Finally, if the state engineer is satisfied that the appropriation has been made in accordance with the application and the water has been put to beneficial use, the state engineer will issue a certificate of appropriation. § 73-3-17. Until the certificate is issued, any right to use the water remains inchoate. *See Mosby Irr. Co. v. Criddle,* 11 Utah 2d 41, 46, 354 P.2d 848, 852 (1960).

■ In the case at bar, the Loosles had only filed an application to appropriate the spring water which had not been acted upon by the state engineer. The application to appropriate the well water had been approved, but no certificate of appropriation had been issued. Therefore, because neither of the water rights was perfected, the Loosles' rights were inchoate. This inchoate right does not give the applicant a vested right to the use of water sought to be appropriated but only gives a right to complete the appropriation and put the water to beneficial use in compliance with the act. *Duchesne County v. Humphreys,* 106 Utah 332, 335, 148 P.2d 338, 339 (1944). As a result, because the Loosles' interests in both water sources were not perfected, the rights to use the water could not pass as appurtenances.

■ Although a right to use water cannot become appurtenant to land before it is vested by the issuance of a certificate of appropriation, an inchoate right under an unperfected application can be transferred. Section 73-3-18 provides in part:

Prior to issuance of certificate of appropriation, rights claimed under applica-

tions for appropriation of water may be transferred or assigned in instruments in writing.

Thus, it was possible to transfer the Loosles' inchoate rights to the well and spring. Although we concluded in *Little* that the inchoate water rights were not conveyed by the deed, the case at bar is significantly different. In *Little*, the grantor was attempting to transfer water rights by a warranty deed, while in this case the water rights are encumbered by a trust deed. The language of the warranty deed in *Little* encompassed only "improvements and appurtenances" to the land. The language of the trust deed is broader. Not only does the trust deed include all "appurtenances," but also the language specifically purports to include all "rights," "water," and "water rights" now or hereafter attached to the property. Because, pursuant to section 73–1–11, a perfected water right will pass as an appurtenance without specifically mentioning the vested water right, the trust deed's use of additional language beyond "appurtenances" to include "water and water rights" evidences an intent to convey water rights that had not yet vested and become appurtenant.

Although the trust deed does not specifically mention filings with the state engineer regarding the use of the spring or well, references to these filings would have been impossible because they were unascertained in 1980 when the trust deed was signed. Furthermore, lenders frequently provide loans for extended periods of time during which water usage and water rights can change dramatically. With each change, additional documents may be filed with the state engineer. It would be unreasonable to require lenders to hypothesize all possible rights and uses of water on the trust property to specifically include them in the trust deed. The stability of debtor and creditor relations would be undermined if all loan documents had to be constructed to fit the particular position of each party every time the rights associated with water changed. Due to the evolving nature of water and water rights, flexibility is needed to permit the best use. The language in the trust deed referring to "water" and "water rights" in addition to "appurtenances" suggests that the parties intended to encumber whatever rights might evolve, whether inchoate or perfected.

Although the water rights were not appurtenant to the property, we agree with the trial court that the trust deed encumbered all water rights, both inchoate and perfected. Therefore, any rights or interest acquired by the Loosles after signing the trust deed, including their inchoate rights and documents evidencing that right or interest, are now owned by First Federal by virtue of its purchase at the foreclosure sale.

■ Finally, First Federal requests an award of attorney fees for successfully bringing and maintaining this quiet title action. It points out that there are provisions in both the promissory note and the trust deed for attorney fees, but it offers no analysis as to how those provisions afford a basis for an award in this action. Nor does our analysis of those provisions support First Federal's request. The promissory note provides for fees "if suit is brought to collect this Note." The trust deed provides for fees "in pursuing the remedies provided in this paragraph 18," which remedies are those "permitted by law," i.e., judicial or nonjudicial foreclosure. We conclude that neither of the provisions is broad enough in scope to cover fees incurred in this quiet title action.

We affirm the judgment quieting title to Loosle Spring and the fractional interest in the well in First Federal.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.