*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 31**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

ROCKY FORD IRRIGATION COMPANY,
*Appellant,*

*v.*

KENTS LAKE RESERVOIR COMPANY and DOES 1 THROUGH 200,
*Appellees,*

and

BEAVER CITY,
*Intervenor and Appellee.*

No. 20170290
Filed July 11, 2019

On Direct Appeal

Fifth District, Beaver County
The Honorable Paul D. Lyman
No. 100500156

Attorneys:

Stephen E.W. Hale, Matthew E. Jensen, J. Mason Kjar, Salt Lake City,
for appellant

John H. Mabey Jr., David C. Wright, Salt Lake City, for appellees
Kents Lake Reservoir Company and Does 1 through 200

Justin W. Wayment, Christian Jones, Cedar City, for intervenor-
appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUSTICE PEARCE, and
JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1     This case comes to us on direct appeal from the Fifth District Court. Rocky Ford Irrigation Company and Kents Lake Reservoir Company[1] both have water rights in the Beaver River. As changes occurred—both in water rights and in irrigation techniques—the administration of the Beaver River grew increasingly complex. Rocky Ford sued Kents Lake seeking clarification regarding priority of rights and Kents Lake's obligations as to river administration and measurement. Rocky Ford lost on each of its claims below and accordingly appealed. We affirm in part, reverse in part, and remand.

I

¶2     Around 1870, settlers began diverting water from the Beaver River and directly conveying it through canals and ditches to their crops. These initial rights were direct flow rights—the right to take water from the source and apply it directly to the end use without reservoir storage. After most of the base flow of the Beaver River was allocated to direct flow rights, water users constructed reservoirs to store spring runoff and winter flows to allow for later use on their crops.

¶3     Rocky Ford and Kents Lake are water users in the Beaver River System. Both have direct flow and storage rights dating back to the first determination of rights in the Beaver River in 1916.

¶4     Rocky Ford acquired various direct flow rights with priority dates of 1870, 1890, 1903, 1907, and 1909. Kents Lake and its shareholders also acquired direct flow rights. Kents Lake's direct flow rights had priority dates of 1870, 1890, and 1903.

¶5     These parties also hold storage rights in reservoirs they built. Rocky Ford constructed Minersville Reservoir at the bottom of the Beaver River System. It holds a 1907 storage right to divert water into the Minersville Reservoir. Kents Lake constructed Upper Kents Lake and Middle Kents Lake Reservoirs, collectively called the

---

[1] There is some inconsistency in the spelling of this party's name in the briefing and record of this case. The briefs on appeal use the "Kents Lake" formulation. In the lower court, the party is often referred to as "Kent's Lake." We stick with the former formulation in this opinion except when quoting from the district court record.

"South Fork Reservoirs," in the headwaters of the Beaver River System. Kents Lake holds an 1890 storage right to divert water into the South Fork Reservoirs.

¶6   In the early 1900s, the Fifth District Court conducted a general adjudication of the Beaver River culminating in the issuance of the Beaver River Decree (Decree) in 1931. The Decree established and confirmed priority dates and use limitations on Beaver River water rights. It confirmed direct flow rights acquired by Rocky Ford in 1870, storage rights acquired by Rocky Ford in 1907, and other direct flow rights acquired by Rocky Ford on later dates. It also confirmed storage rights for Kents Lake in South Fork Reservoirs (acquired in 1890) as well as direct flow rights for certain Kents Lake shareholders.[2] The Decree also divided the Beaver River into two— an upper and lower portion of the river with the Patterson Dam serving as the dividing line. Water users located above the dam were denominated "upper users" and were allowed to divert water prior to "lower users" despite a later priority date.[3]

¶7   The Decree also required users to "promptly install and perpetually maintain suitable . . . measuring devices at or [as] near as possible to their respective points of diversion or at such other points as may be designated in their decree, for the measurement of all water diverted hereunder for consumptive uses." Under the Decree, water users were "permanently enjoined from diverting . . . any water for such consumptive purposes through any ditch, canal, conduit or other device not provided with proper headgates, control works, and measuring devices."

¶8   A few years after the Decree, Kents Lake sought to build an additional reservoir—Three Creeks Reservoir. And in 1938 Kents Lake filed an application with the State Engineer under Utah Code section 100-3-3, seeking to change the place of storage of 830 acre-feet

---

[2] Kents Lake and Kents Lake's shareholders are collectively referred to throughout this opinion as "Kents Lake."

[3] This divide was approved because lower users were usually benefitted by return flows. Return flows refer to water that is not consumed by plants or through evaporation that ultimately flows back, either above or below ground, into the source. Flood irrigation, the primary method of water use employed at the time of the Decree, consumed only 40% of the diverted water, leaving 60% to reenter the Beaver River as return flow.

of water from South Fork Reservoir to Three Creeks Reservoir. Then, in 1940, Kents Lake submitted an application with the State Engineer, seeking the right to store an additional 1,193 acre-feet of water in Three Creeks Reservoir. The State Engineer reviewed the applications and put the other water users in the Beaver River System on notice of Kents Lake's proposed changes. Rocky Ford protested both the change and the new application for appropriation before the State Engineer. The State Engineer found that despite Rocky Ford's protests, both Kents Lake's changed use and new appropriation request would put the water towards a beneficial use and not impair existing rights. Accordingly, the State Engineer granted both Kents Lake's requests.[4]

¶9 In 1953, Rocky Ford and Kents Lake entered into an agreement (Agreement) to "provide for the practical administration of storage . . . and to prevent future controversy concerning the diversion for storage." The Agreement provided that (1) Rocky Ford would not protest Kents Lake's planned change application seeking an option storage right in Three Creeks Reservoir, (2) Kents Lake would not oppose Rocky Ford's enlargement of its reservoir, and (3) Rocky Ford has an exclusive right to store all water available to it from November 1 to the following April 1 each year.

¶10 As agreed, Kents Lake submitted a change application to the State Engineer seeking to create an option storage right in Three Creeks Reservoir. Rocky Ford, as promised, did not protest the application. The State Engineer approved the application and granted Kents Lake's request for these "direct-storage changes." Kents Lake now had a direct-storage right, allowing it to either use the water directly or store it in Three Creeks Reservoir.

¶11 Once Kents Lake's change application was approved, Kents Lake sought to "perfect" its changed use. This entailed entering into a "period of proof" where Kents Lake applied the water to the changed use under the supervision of the State Engineer. Once the State Engineer was satisfied that the water was being used in

---

[4] Rocky Ford challenged the State Engineer's approval, eventually appealing the case to this court. This court upheld the approved changes and concluded that Kents Lake could divert water into Three Creeks Reservoir if it would have been available for storage in South Forks Reservoirs. *Rocky Ford Irrigation Co. v. Kents Lake Reservoir Co.*, 135 P.2d 108, 114 (Utah 1943).

accordance with the change application and was put to a beneficial use, Kents Lake received a certificate from the State Engineer that served as "prima facie evidence of the owner's right to the use of the water in the quantity, for the purpose, at the place, and during the time specified therein, subject to prior rights." UTAH CODE § 73-3-17 (1953). Kents Lake received a certificate from the State Engineer perfecting its direct-storage right.

¶12 Beginning in the 1970s, users of the Beaver River began to gradually convert from flood irrigation to sprinkler systems. Sprinklers are a more efficient watering mechanism. They require diversion of less water and produce less return flow.[5] Some upper river users store these efficiency gains, reducing the amount of water flowing in the Beaver River. This reduction in flow can adversely affect downstream users like Rocky Ford if there is insufficient water in the river to fulfill lower users' rights.

¶13 The above changes, decrees, advancements, and agreements have made the administration of the Beaver River increasingly complex. In 2003, Rocky Ford asked the State Engineer to enhance oversight of the Beaver River storage. Over the next year and a half, Rocky Ford, Kents Lake, and the State Engineer corresponded about improved storage regulation. And the State Engineer found that Kents Lake's measurement devices were deficient.

¶14 Still unsatisfied, Rocky Ford filed a lawsuit in district court in November 2010 alleging water right interference, conversion of water rights, and negligence, and seeking declaratory relief, injunctive relief, and rescission of the 1953 Agreement. Rocky Ford contends that its water rights have been impaired by direct-storage changes and other actions taken by Kents Lake, including Kents Lake's failure to measure its water in accordance with the Beaver River Decree. Kents Lake filed a counterclaim seeking clarifications of the parties' water rights under the Agreement. Three years later Beaver City was allowed to intervene.

¶15 Following discovery, Rocky Ford moved for partial summary judgment. It asserted that (1) the direct-storage changes maintain an 1890 priority date only to the extent they don't impair

---

[5] In contrast to flood irrigation, which consumes only 40% of the diverted water and leaves the remainder for return flow, sprinkler irrigation consumes about 75% of the diverted water and leaves only 25% for return flow.

Rocky Ford's direct flow rights, and (2) Rocky Ford's direct flow rights are not subordinated or waived under a plain language reading of the Agreement. The district court denied the motion. In so doing, the court concluded that Rocky Ford had "intentionally waived its direct flow rights against [Kents Lake] through its entrance into the 1953 agreement" and that Kents Lake could continue to store its water as it has "even to the detriment of [Rocky Ford]'s direct flow rights."

¶16 The parties stipulated to dismissal of all claims for damages, leaving only claims for injunctive relief, declaratory relief, and rescission of contract. At trial, the court's denial of Rocky Ford's motion for summary judgment precluded any evidence concerning the priority of the direct-storage changes or the meaning of the Agreement. The court focused on Kents Lake's measurement obligations and Rocky Ford's claims related to the continued efficacy of the Agreement. During the three-day bench trial, the court refused to admit evidence from Rocky Ford's expert about the impact of sprinklers on the historic return flow to the Beaver River.

¶17 On June 28, 2016, the trial court issued its written Memorandum Decision. The court first denied Rocky Ford's request for injunctive and declarative relief regarding Kents Lake's measurement obligations. Because Kents Lake had followed the instructions of the State Engineer with regard to measurement, the district court concluded that Rocky Ford was not entitled to declarative or injunctive relief. The district court also declined to rescind the 1953 Agreement. It concluded that Rocky Ford had not proved material breach, impracticability, frustration of purpose, or mutual mistake. Lastly, the district court awarded attorney fees to Kents Lake and Beaver City *sua sponte* under Utah Code section 78B-5-825.

¶18 The district court later denied Rocky Ford's rule 59 motion seeking reversal of the fee award. Rocky Ford then filed this appeal.

II

¶19 Rocky Ford seeks reversal of the district court's decision denying the motion for partial summary judgment, its entry of final judgment, and its award of attorney fees. Five principal questions are presented for review. First, did the trial court commit legal error when it denied Rocky Ford's motion for summary judgment? Second, did the trial court err in refusing to declare that Kents Lake could not store the water it saved through improved efficiency? Third, did the trial court err in refusing to declare that Kents Lake

must measure its usage consistent with the requirements of the Beaver River Decree? Fourth, did the trial court err in refusing to rescind the 1953 Agreement? And fifth, did the trial court err in awarding attorney fees to Kents Lake and Beaver City?

¶20 We affirm the denial of Rocky Ford's motion for partial summary judgment on alternative grounds. And we affirm the trial court's holdings that Rocky Ford had no claim on Kents Lake's efficiency gains and that the 1953 Agreement should not be rescinded. But we reverse and remand on the district court's refusal to enter a declaratory judgment regarding Kents Lake's measurement obligations. We also reverse the denial of the rule 59 motion and hold that Kents Lake and Beaver City are not entitled to attorney fees.

A

¶21 The first question presented for review is whether the district court committed legal error in denying Rocky Ford's motion for summary judgment. The court concluded that Rocky Ford had intentionally subordinated its direct flow rights to Kents Lake's rights and that Kents Lake could take and use water to Rocky Ford's detriment. The court treated this issue as a matter of contract interpretation. In denying the motion, the district court concluded that the 1953 Agreement was clear and unambiguous and established that Rocky Ford intentionally subordinated its direct flow rights, allowing Kents Lake to use the water to Rocky Ford's detriment. We disagree with the district court's determination that the Agreement clearly and unambiguously established that Rocky Ford intentionally subordinated its direct flow rights. Yet we affirm the denial of the motion for summary judgment on alternative grounds advanced by Kents Lake.

1

¶22 In its order denying Rocky Ford's motion for summary judgment, the district court relied entirely on the language of the Agreement. The first two recital paragraphs of the Agreement state that both Rocky Ford and Kents Lake have "various rights in the Beaver River."[6] The fourth recital paragraph identifies the priority

---

[6] The text of relevant "whereas" clauses are as follows:

WHEREAS, Rocky Ford has *various rights* to the use of water of the Beaver River and its tributaries,

(continued . . .)

dates of some of these rights.[7] And the fifth recital paragraph describes the purpose of the Agreement—"to provide for the practical administration of storage under the water rights mentioned *above* and to prevent future controversy concerning the diversion of storage under said water rights . . . ." (emphasis added). The Agreement then sets forth its terms in greater detail.

¶23 The district court believed that the conflict between Rocky Ford and Kents Lake hinged on which of Rocky Ford's water rights were implicated in the fifth recital clause's reference to the "above" rights. The court held that the "above" rights referred to in the fifth recital clearly implicated not only the rights detailed in paragraph four but the various rights owned by Rocky Ford referred to in paragraph one. It was "baffle[d] . . . to learn that [Rocky Ford] want[ed it] to read 'various rights' to mean 'various rights except Rocky Ford's direct flow rights.'" To interpret the contract to waive only part of Rocky Ford's rights, the court reasoned, "would nullify the 1953 agreement." The court thus concluded that Rocky Ford had unambiguously waived its direct flow rights and given Kents Lake's changed use senior priority. So Kents Lake was permitted to use its changed water right to Rocky Ford's detriment.

¶24 We are unable to affirm the district court's interpretation of the Agreement. We think the reference to "above rights" in the fifth recital may well refer only to those rights specifically detailed in

---

including Application No. 1215, Certificate No. 2388, issued by the State Engineer of the State of Utah; and WHEREAS Kent's Lake has various rights to the use of waters of the Beaver River and its tributaries . . . . (emphasis added).

[7] The full text of the relevant whereas clause is as follows:

WHEREAS, the priority date of the water right of Kent's Lake for its said 1660 acre feet is 1890, and the priority date of Rocky Ford under its Certificate No. 2388 for 25,477.5 acre feet is February 25, 1907, and the priority date of Kent's Lake Application No. 13420 for 1193 acre feet is March 8, 1940, and the priority date of the direct flow rights of the various stockholders of Kent's Lake referred to herein have priority dates of 1890 and earlier . . . .

paragraph four, and not to Rocky Ford's "various rights" referenced in paragraph one. For that reason we disagree with the district court's decision to deny summary judgment on the basis of its interpretation of the Agreement. Yet we do not disagree with the district court's ultimate holding—that Kents Lake's direct-storage rights are senior in priority to certain Rocky Ford direct flow rights. We just reach this conclusion on alternative grounds advanced by Kents Lake.

2

¶25 Kents Lake did not advance the theory of contract interpretation endorsed by the district court below. Instead, it argued that Rocky Ford had "agreed it was not impaired" under doctrines of "waiver, release, ratification, or . . . estoppel." Rocky Ford, Kents Lake argues, waived its protest of Kents Lake's change application with the State Engineer. So Rocky Ford is precluded from claiming impairment now. We agree.

¶26 A water user can apply to change its rights in a water source. To do so, the water user must file a change application with the State Engineer. UTAH CODE § 73-3-3 (1953). A changed use involves a change in the "place of diversion or use" of the water for a purpose other than that "originally appropriated." *Id.* A changed use is not permitted "if it impairs any vested right." *Id.* Other water users are entitled to file a protest with the State Engineer, claiming that the change would impair vested rights in the water source. *Id.* § 73-3-7 (1953). As contracted for in the Agreement, Kents Lake applied for a changed use to convert part of its direct flow rights into a hybrid direct-storage right. And true to the Agreement, Rocky Ford did not protest the change. The change application was then approved by the State Engineer.

¶27 Rocky Ford now wants to establish that Kents Lake's changed use is junior to Rocky Ford's direct flow rights. The question we must therefore resolve is how a change application affects priority. If a change application retains the original priority date, Rocky Ford's rights are junior to Kents Lake's, and Kents Lake can use its water to the detriment of Rocky Ford. But if a change application receives the priority date of the approved change, Rocky Ford's rights would be senior to Kents Lake's direct-storage right.

¶28 We resolve this question under the text of section 73-3-3. This provision says that "[a]ny person holding an approved application for the appropriation of water may in like manner, either permanently or temporarily, change the point of diversion, place or

purpose of use, but no such change of approved application shall affect the priority of the original application." *Id.* § 73-3-3. A plain reading of this section indicates that a change application does not alter the priority date of the original right.

¶29 This reading is supported by our case law. In *Hague v. Nephi Irrigation Co.*, we explained that "[w]hen water has been lawfully appropriated, the priority thereby acquired is not lost by changing the use for which it was first appropriated and applied, or the place at which it was first employed, provided that the alterations made . . . shall not be injurious to the rights acquired by others prior to the change." 52 P. 765, 769 (Utah 1898) (citation omitted) (internal quotation marks omitted). So a changed use that is approved by the State Engineer receives the priority of the original right.

¶30 Rocky Ford holds a vested water right acquired prior to the direct-storage changes. And now Rocky Ford claims to be impaired by the direct-storage changes. Both section 73-3-3 and *Hague* acknowledge that a change cannot impair the vested rights acquired by other users. UTAH CODE § 73-3-3 (1953); *Hague*, 52 P. at 769. Rocky Ford believes this creates a hybrid priority date system. It asks this court to hold that changed uses should be administered: "(1) to the extent [there is] impairment, based on the priority date of the change[;] and (2) to the extent there is no impairment[,] based on the Original Priority." Because Kents Lake's changed use cannot impair a vested right, Rocky Ford asserts that its right is senior to the changed use insofar as the changed use impairs Rocky Ford's vested rights. As long as the change does not impair another right, in other words, Rocky Ford asserts that it is entitled to the original priority date.

¶31 We disagree. We do not see evidence in the code, or in our case law, for interpreting the statute in this way. A plain reading of section 73-3-3 and *Hague* indicates that changed use should be administered in accordance with the original priority date.

¶32 Rocky Ford is right that a changed use should not impair a vested right. But that does not give parties the ability to claim impairment in perpetuity. Kents Lake asserts that an impairment claim must be raised during the protest period before the State Engineer. And because Rocky Ford did not challenge the change application through the appropriate administrative mechanisms it is unable to claim impairment now. We agree.

¶33 Rocky Ford asserts that the administrative proceedings before the State Engineer cannot be the parties' only opportunity to

argue impairment. It points to our *Searle* opinion and asserts that Kents Lake's proposed reading—that a party must raise claims with the State Engineer during the protest period in order to raise them before the courts—is incompatible with the holding of the *Searle* court. *Searle v. Milburn Irrigation Co.*, 2006 UT 16, 133 P.3d 382. In *Searle*, we said that "it is well established that the state engineer has no authority to finally adjudicate water rights." *Id.* ¶ 34. We clarified that the State Engineer approves applications if there is "reason to believe" that no impairment will occur. *Id.* ¶ 37. But we explained that "[d]etermining whether an applicant has, in fact, proven that the new manner of use does not impair vested rights is a matter ultimately left to a final judicial determination of rights." *Id.*

¶34 We reaffirm what we said in *Searle*. The courts, and not the State Engineer, are the final adjudicators of water priority. But this does not altogether relieve a party from an obligation to raise its claims first through the administrative mechanism created by our law.

¶35 Requiring parties to first raise protests with the State Engineer before review by the courts does not make the State Engineer the final adjudicator of water rights. Courts have the authority to review and reverse the determinations of the State Engineer. Yet the law has established a protest period as an administrative mechanism for parties to raise claims of impairment. And our case law has required participation at the administrative level as a prerequisite to challenging the State Engineer's determination on appeal. *Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 849 (Utah 1998) ("Requiring the State Engineer to scour his/her records to determine what, if any, water rights a given protester has that may be affected by a change application would eviscerate the requirement that it is the protesters' responsibility to make known the nature of their protest before the State Engineer."); *S & G, Inc. v. Morgan*, 797 P.2d 1085, 1087–88 (Utah 1990) (holding that the plaintiff lacked standing to challenge a change application because it waived its right to participate at the appellate level by its intentional inaction at the administrative level).

¶36 The State Engineer will review and adjudicate claims of impairment and approve a change application if there is "reason to believe" that the approval will not impair vested water rights. *Searle*, 2006 UT 16, ¶ 31; *see also* UTAH CODE § 73-3-3 (1953). After a change application has been approved, parties enter into a period of "proof" to perfect the change. UTAH CODE § 73-3-12 (1953). In this stage, the applicant can "proceed and perfect the appropriation by applying

the water to beneficial use." *Loosle v. First Fed. Sav. & Loan Ass'n of Logan*, 858 P.2d 999, 1002 (Utah 1993). If the State Engineer is satisfied that "a permanent change of point of diversion [or] place or nature of use has been perfected in accordance with the application . . . and that the water . . . has been put to a beneficial use," the State Engineer issues a certificate. UTAH CODE § 73-3-17 (1953). That certificate is "prima facie evidence of the owner's right to the use of the water in the quantity, for the purpose, at the place, and during the specified time therein, subject to prior rights." *Id.*

¶37 Utah Code section 73-3-14 expressly authorizes judicial review of the State Engineer's decision. It allows parties who are aggrieved by a decision by the State Engineer to bring an action for plenary review in the district court within sixty days. *Id.* § 73-3-14 (1953). Rocky Ford did not do so. Whether it *could not* (based on its Agreement not to protest) or simply *did not* is irrelevant. Kents Lake went through the administrative processes in both filing its application and in perfecting its right. And Rocky Ford did not seek any relief through the prescribed administrative channels at either stage. Kents Lake now has a perfected right in the direct-storage changes with an 1890 priority date. And Rocky Ford can no longer claim it is impaired.

¶38 We affirm the denial of Rocky Ford's motion for summary judgment on this basis. Rocky Ford's motion asked the court to conclude that Kents Lake's direct-storage changes maintained an 1890 priority only to the extent they did not impair Rocky Ford's direct flow rights. As explained above, our case law and relevant statutes indicate that Kents Lake's changed use receives original 1890 priority. And Rocky Ford, having failed to participate in any administrative proceedings, cannot now claim impairment.

B

¶39 The second question presented concerns Rocky Ford's claim that the trial court erred when it refused to enter a declaratory judgment that Kents Lake cannot store the water it saves through increased efficiency. We find no error in the district court's conclusion. Kents Lake is entitled to use its water in the most efficient manner within the bounds of its right. Lower users have a claim on return flow once it reenters the stream, but not on an upper user's efficiency gains.

¶40 Kents Lake switched to sprinklers as its irrigation method in the 1970s. Sprinklers are a more efficient watering mechanism than flood irrigation—they use less water and create less return flow. And

because of the direct-storage changes, Kents Lake is able to store the excess water produced by more efficient irrigation. If Kents Lake had only a direct flow right, as it did initially, the saved water would remain undiverted in the Beaver River. But the direct-storage changes allow Kents Lake to store its excess water. Kents Lake's ability to save the excess water without creating large return flows puts less water in the river for downstream users like Rocky Ford. With this in mind, Rocky Ford seeks a declaratory judgment that requires Kents Lake to divert less water instead of storing its efficiency gains.

¶41 To the extent Kents Lake's direct-storage rights (now established to have 1890 priority) are senior to Rocky Ford's direct flow rights, it is clear that Kents Lake is under no obligation to produce any return flow. Typically, a senior user is entitled to use its water to the detriment of a junior user.[8]

¶42 So, any right junior to Kents Lake's direct-storage right has no claim on Kents Lake's efficiency gains.

¶43 This is not the end of the inquiry, however. Some of Rocky Ford's direct flow rights have an 1870 priority that is senior to the priority of the Kents Lake's direct-storage right. And the Beaver River Decree creates unique problems with this administration. It allows certain upper users (as defined by the line of demarcation) to divert water from the Beaver River prior to the lower, senior users taking their water. This is contrary to how water rights are usually administered. In most water administration, junior users of water are not entitled to take any of their water until the senior user's right has been entirely fulfilled. *Salt Lake City v. Silver Fork Pipeline Corp.*, 2000

---

[8] *See, e.g.*, UTAH CODE § 73-3-1 (establishing a first-in–time, first-in-right appropriation scheme); *Salt Lake City v. Silver Fork Pipeline Corp.*, 2000 UT 3, ¶ 34, 5 P.3d 1206 *overruled on other grounds by Jensen v. Jones*, 2011 UT 67, ¶ 15, 270 P.3d 425 ("A senior appropriator is guaranteed the full measure of his or her appropriation before any claim by a junior appropriator may be satisfied."); *Hanson v. Salt Lake City*, 205 P.2d 255, 271 (Utah 1949) *superseded by statute as recognized in Fairfield Irrigation Co. v. Carson*, 247 P.2d 1004 (Utah 1952) (Wolfe, J. concurring) ("[I]f the first appropriator's rights are superior under the law, they should be made so in fact . . . ." (citation omitted) (internal quotation marks omitted)).

UT 3, ¶ 34, 5 P.3d 1206 ("A senior appropriator is guaranteed the full measure of his or her appropriation before any claim by a junior appropriator may be satisfied.") *overruled on other grounds by Jensen v. Jones*, 2011 UT 67, ¶ 15, 270 P.3d 425.

¶44 The Beaver River Decree was written in 1931, at a time when the primary method of irrigation was flood irrigation, creating large return flows. It allowed upper junior users to take water prior to lower senior users—likely because it presumed that upper users would create return flow and thus not infringe the rights of the lower senior users. With the advent of more efficient sprinkler irrigation, return flows have decreased and certain lower users, like Rocky Ford, have been affected. The question implicated by these changes—whether an upper user with a junior water right can use water more efficiently to the detriment of a lower user with a senior right—is one this court has never addressed.

¶45 Our case law has long established that parties are free to put water to any beneficial use within their defined right. Water users are entitled to capture and reuse runoff, for example.[9] This practice of reducing return flows to make better use of water is one that existed before sprinklers and before the Beaver River Decree. And our case law has never recognized a water user's right to a call on efficiency gains.[10]

---

[9] *Estate of Steed v. New Escalante Irrigation Co.*, 846 P.2d 1223, 1228 (Utah 1992) ("It has been a universal custom in this state for irrigation and canal companies to make necessary improvements in their systems to prevent loss of water by seepage . . . ." (citation omitted) (internal quotation marks omitted)); *Big Cottonwood Tanner Ditch Co. v. Moyle*, 174 P.2d 148, 150 (Utah 1946) (allowing an irrigation company, in the interest of water conservation, to capture its seepage by lining a ditch).

[10] Our law has also sought to encourage parties to find more efficient uses of their water. "[O]ur statutory and decisional law" is based on "the desirability and . . . necessity of . . . continuous beneficial use of all available water with as little waste as possible." *Delta Canal Co. v. Frank Vincent Family Ranch, LC*, 2013 UT 69, ¶ 24, 420 P.3d 1052 (citation omitted) (internal quotation marks omitted). "[I]t is essential," therefore, that "the highest and best beneficial use should . . . be encouraged [and] carefully safeguarded." *HEAL Utah v. Kane Cty. Water Conservancy Dist.*, 2016 UT App 153, ¶ 5, 378 P.3d

(continued . . .)

¶46 Implicit in Rocky Ford's argument is the notion that lower users have a say in how upper users use water runoff. But this is incorrect. Downstream users have a right to runoff only when it reenters the stream and becomes return flow. *Salt Lake City v. Telluride Power Co.*, 17 P.2d 281, 284 (Utah 1932) (explaining that return flow water loses its separate identity when it reenters the stream). Upper users, such as Kents Lake, are free to recapture runoff on their land and put it to use. But upper users cannot recapture the excess water once it reenters the stream. Rocky Ford and other lower users have a right to this return flow.

¶47 Perhaps the demarcation of the Beaver River through the Decree did not foresee sprinkler use. But it was not novel for parties to capture the runoff from flood irrigation or innovate in other ways to reduce seepage. The Beaver River Decree divided the river into upper and lower users despite this innovation. Sprinklers are only a modern example. Nothing in the Decree itself creates an obligation for upper users to create a return flow, and we do not establish such an obligation here.

¶48 Lower river users have no claim on runoff before it reenters the stream. And lower users have no claim against upper users requiring them to create a return flow. Upper users may use their water right in the most efficient and beneficial way, despite its effect on lower users. We thus affirm the lower court's decision not to enter the declaratory judgment sought by Rocky Ford. Rocky Ford has no claim to Kents Lake's efficiency gains.

C

¶49 The third question presented for our review pertains to Kents Lake's obligations to measure its water use in accordance with the Beaver River Decree. In the proceedings below, Rocky Ford sought both declaratory and injunctive relief, asking the court to clarify Kents Lake's measurement obligations. Rocky Ford contended that Kents Lake does not have measurement devices necessary to satisfy its measurement obligation under the Beaver River Decree. The trial court denied Rocky Ford's requests for both declaratory and injunctive relief. Rocky Ford seeks reversal of those decisions. We affirm the district court's denial of Rocky Ford's request for injunctive relief. But we reverse and remand to the

--------------------------------------------------

1246 (first alteration in original) (citation omitted) (internal quotation marks omitted).

district court for further determinations on the declaratory judgment.

¶50 Rocky Ford asks us to reverse the trial court's decision denying its request for injunctive relief. But Rocky Ford's brief does not adequately address the decision before us on appeal. The district court held that Rocky Ford had failed to carry its heavy burden of proof.[11] Specifically, the district court said that Rocky Ford was unable to show that it had suffered irreparable harm resulting from Kents Lake's failure to fulfill its measurement obligations under the Decree. On appeal, Rocky Ford has not adequately addressed the standard for entry of injunctive relief or sufficiently explained how the district court erred under that standard. We thus affirm the lower court's denial of injunctive relief under our case law requiring an appellant to speak specifically to the terms of an order challenged on appeal. *See Utah Physicians for a Healthy Env't v. Exec. Dir. of the Utah Dep't of Envtl. Quality*, 2016 UT 49, ¶ 16, 391 P.3d 148 (holding that an appellant's failure to address and brief arguments directed at the order under review on appeal was fatal to the appeal).

¶51 The defect in Rocky Ford's argument does not extend to its request for declaratory relief, however. Under Utah Code section 78B-6-402, a party seeking declaratory relief must show by a preponderance of the evidence that the requested relief will terminate an alleged controversy or remove an uncertainty. UTAH CODE § 78B-6-402. Rocky Ford alleges confusion amongst the parties as to the measurement obligations under Utah Law and the Beaver River Decree. And Rocky Ford sought a declaratory judgment clarifying these responsibilities.

¶52 In denying Rocky Ford's request for relief, the trial court stated that "Kent's Lake asserts that it has consistently done whatever the State Engineer or his agent has asked it to do." And it stated that "the State appears satisfied with Kent's Lake." But the district court did not explain how this compliance with the State

---

[11] "A court may grant a permanent injunction if it determines that (1) the petitioner establishes standing by demonstrating special damages, (2) the petitioner has a property right or protectable interest, (3) legal remedies are inadequate, (4) irreparable harm would result, (5) court enforcement is feasible, and (6) petitioner merits the injunction after balancing the equities." *Johnson v. Hermes Assocs., Ltd.*, 2005 UT 82, ¶ 13, 128 P.3d 1151 (footnote omitted).

Engineer excuses a lack of compliance with the Beaver River Decree. And we see no reason to so conclude.

¶53 The State Engineer is tasked with the "general administrative supervision of the waters of the state and the measurement, appropriation, apportionment, and distribution of those waters." *Id.* § 73-2-1(3)(a). But our law mandates that "a person using water in this state . . . shall construct or install and maintain controlling works and a measuring device at: (a) each location where water is diverted from a source." *Id.* § 73-5-4(1). This obligation is independent from and in addition to the duty to install and use measuring devices at "any other location required by the state engineer." *Id.* In this case, the party's measurement obligations are further clarified in the 1931 Beaver River Decree. The Decree says, "the parties hereto and their successors in interest shall promptly install and perpetually maintain suitable and efficient headgates, control works and measuring devices at or near as possible to their respective points of diversion."

¶54 Kents Lake does not dispute that the Beaver River Decree and Utah Code section 73-5-4 require installation of "measuring devices at or near as possible to their respective points of diversion." Nor does Kents Lake dispute that there is no such measuring device at multiple points of diversion into Kents Lake's reservoirs. It instead argues that all measurement required under statute and the Beaver River Decree is to benefit the State Engineer in administering the river. So Kents Lake claims that by complying with the State Engineer it has discharged any duties required of it by statute or the Decree.

¶55 We disagree. Our law creates an independent obligation to measure. *See id.* § 73-5-4(1) (requiring parties to install and maintain measurement devices at each location where water is diverted); *Gunnison Irrigation Co. v. Peterson*, 280 P. 715, 717 (Utah 1929) ("If the defendant violated the terms of the decree, he cannot purge himself of the contempt by showing that no commissioner was appointed."). That obligation exists regardless of whether a party complies with the requests of the State Engineer. This is Rocky Ford's rebuttal. Rocky Ford acknowledges that Kents Lake may have complied with instructions from the State Engineer. But it disagrees that this releases Kents Lake from any independent obligation to measure water in accordance with statute or the Decree.

¶56 We agree with Rocky Ford. Parties have an independent duty to fulfill measurement obligations. Rocky Ford does not seek damages for past mismeasurement or wrongful storage, which

would require us to decide whether following the direction of a State Engineer insulates a water user from claims of damages. Rocky Ford instead asks for clarification moving forward. We find that the clarification it seeks is warranted, and remand to the district court to interpret the parties' measurement obligations under Utah Code section 73-5-4 and the Beaver River Decree, and enter a declaratory judgment clarifying these obligations.

D

¶57 Rocky Ford also appeals the trial court's decision not to rescind the 1953 Agreement. This question implicates two sub-issues. First, did the district court err in refusing to rescind the 1953 agreement on the basis of a material breach? And second, did the district court abuse its discretion when it refused to admit certain evidence Rocky Ford claims was relevant to the rescission claim?

1

¶58 Rocky Ford alleges two material breaches of the 1953 Agreement. The Agreement provides that "Rocky Ford has exclusive right to store all water during the non-irrigation season." But Kents Lake closed the gates of its South Fork Reservoirs in the winter, capturing any inflows and preventing them from reaching Rocky Ford. Kents Lake also failed to comply with the measurement obligations outlined in the 1953 Agreement. Rocky Ford argues that these are "uncured material failure[s] sufficient to render the contract unenforceable." *Aquagen Int'l, Inc. v. Calrae Tr.*, 972 P.2d 411, 414 (Utah 1998) (internal quotation marks omitted).

¶59 We disagree. We affirm on the ground that the alleged breaches were not material.

¶60 The materiality of a contract term is a "fact-like mixed question[]" that is reviewed "deferentially." *Sawyer v. Dep't of Workforce Servs.*, 2015 UT 33, ¶ 11, 345 P.3d 1253. And "rescission is not warranted" where a breach does not "defeat the object of the parties in making the agreement." *Cross v. Olsen*, 2013 UT App 135, ¶ 27, 303 P.3d 1030 (citation omitted) (internal quotation marks omitted). The district court permissibly concluded that Rocky Ford's claimed material breaches did not go to the object of the Agreement. A principal object of the Agreement was to protect new interests. Specifically, it was to ensure that Rocky Ford would not protest Kents Lake's proposed change application and to ensure that Kents Lake would not oppose Rocky Ford's enlargement of its reservoir. While the Agreement restated Kents Lake's measurement obligations and Rocky Ford's exclusive winter storage rights, the

district court could permissibly conclude that the object was not to reaffirm prior obligations both parties already had. Both parties acknowledge that these obligations pre-date the Agreement.

¶61 The object of the Agreement was for Rocky Ford to enlarge its reservoir and for Kents Lake to apply for the change application free from Rocky Ford's protest. Because Kents Lake's alleged breaches do not go to material terms of the Agreement, the trial court acted within the bounds of its discretion in determining that the breaches were not material and in declining to rescind the Agreement on this ground.

2

¶62 Rocky Ford also claims that the trial court abused its discretion when it excluded evidence that allegedly supported Rocky Ford's rescission claim. It asks us to reverse this determination. But we "afford district courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (citation omitted) (internal quotation marks omitted). And we will not determine that the district court abused its discretion unless its "decision exceeds the limits of reasonability." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). We do not believe that the trials court's exclusion of evidence here "exceeds the limits of reasonability." *See id.* We accordingly affirm the exclusion of the evidence in question.

¶63 The district court found that testimony about the historic return flow to the Beaver River was irrelevant. Rocky Ford challenges that decision. It asserts that evidence of historic return flow would have enabled it to prove impracticability, frustration of purpose, or mutual mistake as a basis for rescission. And it contends that the district court committed reversible error in excluding evidence of historic return flows.

¶64 We disagree and affirm. The trial court's ruling on the rescission claim was not based on Rocky Ford's lack of evidence regarding return flows. To the contrary, the court found that the 1953 Agreement had "nothing to do with return flows." The court supported this conclusion by correctly noting that the Agreement is silent as to runoff, return flows, and Rocky Ford's position as a downstream water user. Each of Rocky Ford's alleged rescission theories required a finding that return flows were so fundamental to

the Agreement that the reduction of them would have made the Agreement unenforceable.[12] And the district court concluded that this was not the case, regardless of what the evidence of return flow showed.

¶65 The district court did identify a number of issues that Rocky Ford lacked sufficient evidence to prove. But it ultimately rejected Rocky Ford's rescission claim on the ground that Rocky Ford could not prove that return flows were relevant to the Agreement. The trial court acted within its discretion in so doing. We thus affirm the exclusion of Rocky Ford's evidence and the court's determination not to rescind the 1953 Agreement.

E

¶66 The final issue on appeal concerns the trial court's award of attorney fees. After trial, the court *sua sponte* awarded attorney fees to Kents Lake and Beaver City under Utah Code section 78B-5-825 based on a determination that Rocky Ford's claims were "without merit and not brought or asserted in good faith." Rocky Ford

---

[12] Rescission of a contract is an exceptional remedy that must be supported by exceptional facts. Rocky Ford asserted three theories in support of its claim for rescission: impracticability, frustration of purpose, and mutual mistake. Impracticability requires "an unforeseen event [that] occurs after formation of the contract . . . which event makes performance of the obligation impossible or highly impracticable." *Cent. Utah Water Conservancy Dist. v. Upper E. Union Irrigation Co.*, 2013 UT 67, ¶ 28, 321 P.3d 1113 (citation omitted) (internal quotation marks omitted). "Frustration of purpose differs from the defense of [impracticability] only in that performance of the promise, rather than being impossible or impracticable, is instead pointless." *W. Props. v. S. Utah Aviation, Inc*, 776 P.2d 656, 659 (Utah Ct. App. 1989). And mutual mistake requires that "at the time the contract is made, the parties make a mutual mistake about a material fact, the existence of which is a basic assumption of the contract." *Workers Comp. Fund v. Utah Bus. Ins. Co.*, 2013 UT 4, ¶ 27, 296 P.3d 734 (citation omitted). Each of these theories is thus premised on the notion that the fact giving rise to a claim for rescission goes to a material contract term. Yet return flows and runoff were not material to the Agreement. And the trial court accordingly concluded that none of Rocky Ford's theories were legitimate grounds for rescinding the contract.

challenged the award of attorney fees in a rule 59 motion. That motion was denied. Rocky Ford now asks us to reverse the award of attorney fees. It contends that the trial court erred when it determined that Rocky Ford's claims lack merit and were brought in bad faith.

¶67 Utah Code section 78B-5-825(1) calls for an award of attorney fees in civil actions when "the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." This provision requires proof on "two distinct elements." *In re Discipline of Sonnenreich*, 2004 UT 3, ¶ 46, 86 P.3d 712. An award of fees under this provision requires a determination that the losing party's claim was "(1) without merit, and (2) not brought or asserted in good faith." *Id.*

¶68 A determination under the first element, as to the merits of a claim, typically will turn on a conclusion of law—as to whether the losing party's claim lacks a "basis in law or fact." *Id.* ¶ 47 (citation omitted) (internal quotation marks omitted). Such a determination is reviewed for correctness. *Id.* ¶ 45. The second element, by contrast, implicates fact-intensive questions about the losing party's "subjective intent." *Id.* ¶ 49. A party's good faith may be established by proof of "[a]n honest belief in the propriety of the activities in question;" a lack of "intent to take unconscionable advantage of others;" and a lack of "intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Id.* ¶ 48 (alteration in original) (citation omitted) (internal quotation marks omitted). A lower court's findings on this element typically will be afforded a substantial measure of discretion. *Id.* ¶ 45.

¶69 The district court made *sua sponte* findings on the two elements of the statute. Ordinarily we would yield substantial deference to the court's findings on the latter element. But we decline to do so here for two reasons. First is the fact that the district court's findings are infected by legal error. The error is in conflating the two elements of the statute—in suggesting that Rocky Ford's claims were not asserted in "good faith" *because* they were "without merit." Most of the district court's "findings" on the lack of "good faith" are premised on the court's observations about the lack of merit in Rocky Ford's claims. But the two elements are distinct. It is error to "conflate" them. *Id.* ¶ 49 (explaining that "the mere fact that an action is meritless does not necessarily mean that the action is also brought in bad faith"). And a threshold legal error is an abuse of discretion that undercuts the deference we would otherwise afford to the district court. *Goggin v. Goggin*, 2011 UT 76, ¶ 26, 267 P.3d 885

("An error of law by the district court . . . would be an abuse of discretion.").

¶70 The district court did make two "findings" that seem to treat the "good faith" inquiry as distinct. It faulted Rocky Ford for dismissing a claim against the Division of Water Rights—concluding Rocky Ford allowed this claim to be dismissed for "no apparent reason." And it criticized Rocky Ford for not "suing all well owners and upstream users, who might be switching from flood irrigation to sprinkler irrigation." These "findings," however, are too lacking in detail and too disconnected from the legal standard of "good faith" to sustain our deference on this appeal.

¶71 This is the second basis for our decision not to defer to the district court's findings. We acknowledge the difficult job of our district court judges. We recognize that the many demands of their busy jobs make it difficult for them to always enter detailed findings on every fact-intensive decision they may make. Detailed findings, moreover, may not be strictly required. But a lack of detail in a lower court's findings will make it more difficult for us to afford deference. When the detail is lacking, we may not be able to understand the discretion that was exercised by the court below. And for that reason we may not be in a position to afford the same level of deference that would otherwise be provided. *Gardner v. Gardner*, 2019 UT 28, ¶ 63 n.58, --- P.3d --- (explaining that without detailed findings of fact "it will be difficult for an appellate court to determine whether the district court's ultimate . . . determination was within its discretion").

¶72 This is the position we find ourselves in here. We see no apparent basis in the record for attributing bad faith to Rocky Ford for dismissing a claim against the Division of Water Rights or for declining to pursue claims against "well owners" or "upstream users" who "might be switching from flood irrigation to sprinkler irrigation." Maybe Rocky Ford lacked a good reason for those decisions. But the district court never explained how those decisions could indicate a lack of good faith on Rocky Ford's part in bringing or asserting its claims against Kents Lake. And without some explanation on the face of the district court's order, we find no basis for deferring to the ultimate determination of bad faith.

¶73 Absent a basis for deference, moreover, we find no basis for an award of attorney fees. Most of Rocky Ford's claims have admittedly failed on their merits. But we find no basis for a determination that Rocky Ford filed or pursued its claims in bad

faith. For that reason, we reverse the award of attorney fees to Kents Lake and Beaver City.

III

¶74 We affirm the trial court's denial of summary judgment, its decision not to issue a declaratory judgment prohibiting Kents Lake from storing its efficiency gains, and its decision not to rescind the 1953 Agreement. We reverse, however, the award of attorney fees to Kents Lake and Beaver City.

¶75 We also reverse and remand the trial court's decision not to clarify Kents Lake's measurement obligations. We remand with instructions to interpret the Beaver River Decree and enter a declaratory judgment clarifying the specific measurement obligations of both parties under the Decree.

———————